IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE CHAMBERLAIN GROUP, INC.,        )
and JOHNSON CONTROLS                )
INTERIORS LLC,                      )
                                    )
            Plaintiffs,             )
                                    )
     vs.                            )   No. 05 C 3449
                                    )
LEAR CORPORATION and FORD           )
MOTOR COMPANY,                      )
                                    )
            Defendants.             )

### MEMORANDUM OPINION AND ORDER

Plaintiffs Chamberlain Group, Inc. (Chamberlain), and Johnson Controls Interiors, LLC (Johnson Controls) (collectively plaintiffs) brought this action against defendants Lear Corporation (Lear) and Ford Motor Company (Ford) (collectively defendants), alleging infringement of U.S. Patent Nos. 6,154,544 ('544 patent) and 6,810,123 ('123 patent). The patents involve technology for the secure opening and closing of moveable barriers, and for use in security systems such as universal garage door openers. Plaintiffs have moved for a preliminary injunction, claiming that Lear has infringed claim 4 of the '544 patent. A Markman[1] hearing was held and we now construe claim 4 and the claims on which it depends.

The construction of the disputed claims is integral to the first step of the preliminary injunction analysis: plaintiffs' reasonable likelihood of prevailing on the merits. To determine plaintiffs' likelihood of success, the court first determines the meaning and scope of the claims, and then compares the construed claims to the accused device to determine the likelihood of

---

[1]Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

the patentee proving infringement. Markman, 52 F.3d at 976. Below we only address the first step, claim construction, being mindful that the constructions set forth below may impact the remaining arguments contained in the parties' preliminary injunction briefs.

## BACKGROUND

The general background is taken from the parties' memoranda, Markman presentations, and the patents. Chamberlain is the patentee of the '544 and '123 patents, and seller of garage door openers under the trade names Security+™, Chamberlain, Lift-Master, and Sears Craftsman. Johnson Controls is the exclusive licensee of the '544 and '123 patents for developing radio frequency transmitters for sale to automotive original equipment manufacturers.

Johnson Controls has sold and supplied Chamberlain's garage door openers to Ford for integration into Ford vehicles, allegedly on an exclusive basis. Chamberlain learned that Lear had offered to sell transmitters to Ford for installation in Ford vehicles. Chamberlain asserts that Lear's transmitters would work with its garage door openers, which indicates that Lear's transmitters use Chamberlain's patented technology. Chamberlain contends that Lear is marketing and selling its transmitters at a lower cost because Lear does not have to recoup the research and development costs that Chamberlain has invested in its patents.

The garage door openers, integrated into automobile visors and rear view mirrors, for example, involve a transmitter and receiver that communicate with a radio frequency transmission known as a code stream. A portion of the code stream changes with each transmission, and another segment of the stream remains fixed. The transmitted code is encrypted and subsequently decrypted by the receiving device. This encryption process is at the heart of the patented technology and is thus the crux of this dispute. Rather than

describing this process in our own words, we turn to the claims at issue in the '544 patent, which read as follows:

> Claim 1: A transmitter for sending an encrypted signal to control an actuator, comprising:
> [1] oscillator for generating a radio frequency oscillatory signal;
> [2] apparatus for enabling the sending of an encrypted signal;
> [3] binary code generator responsive to the enabling apparatus for generating a variable binary code, said variable code being different for each enabling by the enabling device;
> [4] trinary code generator for generating a three-valued or trinary code responsive to the variable binary code; and
> [5] transmitting apparatus for modulating the radio frequency oscillatory signal with the trinary code to produce a modulated trinary coded variable radio frequency signal for operation or control of a secure actuator.
>
> Claim 3: A transmitter for sending an encrypted signal to control an actuator according to claim 1, comprising apparatus for producing a fixed code signal and for combining said fixed code signal with a rolling code signal.
>
> Claim 4: A transmitter for sending an encrypted signal to control an actuator according to claim 3, comprising apparatus for interleaving trinary bits derived from said fixed code signal with trinary bits derived from said rolling code signal to produce a trinary interleaved fixed and rolling code signal.

Claim 4 depends on claims 1 and 3, and therefore the limitations in those claims are imported into claim 4. The key disputed terms are "binary code," "binary code generator," "trinary code generator," and "apparatus for producing a fixed code signal and for combining said fixed code signal with a rolling code signal."

Lear construes the claim 1 limitation, "binary code generator responsive to the enabling apparatus for generating a variable binary code, said variable code being different for each enabling by the enabling device," to mean "a processor programmed with a binary arithmetic algorithm operating on an initial binary number to generate a different binary number for each activation of the transmitter" (Lear resp. at 5); (May 31, 2006, hearing trscpt. at 56).

Turning to claim 3, Lear asserts that the fixed code signal is a signal that remains the same in each transmission (Lear resp. at 6). Lear construes "apparatus for producing a fixed code signal and for combining said fixed code signal with a rolling code signal" from claim 3, to mean "a processor programmed with an algorithm producing a signal that, when transmitted, has some code portions which change and some code portions which do not change between each activation of the transmitter." We understand Lear's constructions to be geared toward its non-infringement arguments which, as noted above, are beyond the scope of this opinion.[2]

Chamberlain's primary objection to Lear's constructions is Lear's use of the term "binary number" to improperly circumscribe the meaning of "binary code." Chamberlain asserts that the ordinary meaning of binary code is "a code in which each code element may be either of two distinct kinds of values, which code may represent various kinds of letters and numbers including, but not limited to, a representation of a base 2 number"(Chamberlain reply at 3).[3] In support of this construction, Chamberlain explains that binary code is representational, and that nothing in the specification or prosecution history limits the term to base 2 numbers *(see* trscpt. at 43, 69). Chamberlain defines binary code generator as "a processor programmed to respond to the enabling device to generate a binary code that is

---

[2] In its non-infringement arguments, Lear asserts that its device operates wholly in trinary numbers and does not require binary or trinary code generators, while Chamberlain's device begins with a binary number that must be converted into a trinary or three-valued number (*see* trscpt. at 58-59.) Lear further contends that its transmission is comprised of a variable signal without a fixed portion. While knowledge of an allegedly infringing product can "provide[] meaningful context" for claim construction, "a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process." Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1326-27 (Fed.Cir.2006).

[3] A base number is "An integer whose successive powers are multiplied by coefficients in a positional notation system." THE NEW IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONIC TERMS, FIFTH EDITION, p. 93. Thus, if the base (also known as "radix") is 2, then 134 means 1 times 2 to the second power, plus 4 times 2 to the first power, plus 3 times 2 to the zero power (*see id.*, at 1062).

different for each activation of the enabling device" (Reply at 3) Trinary code generator is construed as "a processor programmed to generate a trinary code in response to the variable binary code" (*id*). According to Chamberlain, "fixed code signal" means "a coded signal representing a fixed code generated by the processor, regardless of how it is later encrypted before or during the RF transmission" (*id.* at 10). Lastly, Chamberlain contends that the "apparatus for producing a fixed code signal and for combining said fixed code signal with a rolling code signal" should be construed as "a processor programmed to 1) produce a message carrying information indicative of a non-changing code and also 2) combine that message with a message carrying information indicative of a rolling code" (*id.* at 3).

## DISCUSSION

Our claim construction is guided by the Federal Circuit's *en banc* decision in Phillips v. AWH Corp., 415 F.3d 1303 (Fed.Cir.2005). In Phillips, the court addressed "the principal question...[of] the extent to which we should resort to and rely on a patent's specification in seeking to ascertain the proper scope of its claims" (*id.* at 1312). The Phillips court essentially held that while "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude,'... [t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Phillips, 415 F.3d at 1312, 1316.

We take the following from Phillips. In construing the claims of a patent, we should look first to the claims themselves, which "provide substantial guidance as to the meaning of particular claim terms" *(id.* at 1314). As we determine the meaning of such claims, giving them the "ordinary and customary meaning...[they] would have to a person of ordinary skill in the art in question at the time of the invention," we must construe the claims in light of the "same

resources as would [a person of ordinary skill in the art], *viz.*, the patent specification and the prosecution history" *(id.* at 1312-13). *See also* C.R.Bard, Inc. v. United States Surgical Corp., 388 F.3d 858, 862 (Fed.Cir.2004) ("the intrinsic record is the primary source for determining claim meaning"). And, finally, we can turn to extrinsic evidence – general-purpose and technical dictionaries and expert testimony, for example – to "shed useful light on the relevant art," but must consider it only in the context of the intrinsic evidence, including the claim language, specification, and prosecution history. Phillips, 415 F.3d at 1317-18.

After studying the parties' arguments, we find that the intrinsic and extrinsic evidence leads to agreement with plaintiff Chamberlain on the major claim terms in dispute. We will discuss each in turn. As noted above, Chamberlain argues that "binary code" should not be limited to representation of a base 2 number. We agree. Based on the patent, we find that the patentee intended to distinguish "binary code" from "binary number" or "base 2 number." Although both are computer-readable commands displayed in a string of 0s and 1s, patentee's "binary code" can represent a "binary number" (number consisting of only two digits), a "trinary number" (number consisting of only three digits), or any other numeric or symbolic language designations. First, we look at the claims. Nowhere does the claim language use the term "binary number" or "base 2 number," instead, the claim language consistently uses "binary code" and "binary signal." The only place in the patent where "binary code" is even suggested as synonymous with "binary number," is in the patent's preferred embodiment: "Both of the bit values being set in steps 742 and 746 relate to a translation from the three-level trinary bits 0, 1, and 2 to a binary number" (8:45-48). The Federal Circuit has repeatedly held, however, that "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." Innova/Pure Water, Inc. v. Safari Water

Filtration System, Inc., 381 F.3d 1111, 1117 (Fed.Cir.2004). *See also* Phillips, 415 F.3d at 1323; SanDisk Corp.v. Memorex Products, Inc., 415 F.3d 1278, 1286 (Fed.Cir.2005). Additionally, the summary of the invention in the specification does not limit "binary code" to "binary number." In fact, in the entire summary of the invention, the term "binary" is only used to show how the 32-bit encrypted code in the receiver is "compared via a binary subtraction with the stored rolling code" to determine authorization (3:62-63). Without a limitation to "binary number," or clear source code that limits "binary code" to base 2 or binary numbers, we will not read the limited reference in the preferred embodiment into the claim language. Rather, we assume that the patentee intended to revert to the term's customary and ordinary meaning.

We turn, then, to a technical dictionary to aid us in understanding what the ordinary and customary meaning of "binary code" was to a person of ordinary skill in the art. *See* Phillips, 415 F.3d at 1318. ("Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention.") The IEEE Standard Dictionary of Electrical and Electronics Terms, Sixth Edition, has three definitions for "binary code," including "A code in which each code element may be either of two distinct kinds or values, for example, the presence or absence of a pulse," "A code that makes use of members of an alphabet containing exactly two characters, usually 0 and 1," and "A code that uses exactly two distinct characters, usually 0 and 1, to represent data or instructions." The definitions vary only slightly and encompass our understanding of patentee's use of the term "binary code" in the patent. Specifically, the IEEE notes, in definition number two: "The binary number system is one of many binary codes." This further

supports our understanding that the ordinary and customary meaning of "binary code," to one of ordinary skill in the art, is a code consisting of two values, which may represent a binary number, trinary number, ASCII character, decimal number, or any other numerical or character language designation. Therefore, we construe the term "binary code" to be "a code in which each code element may be either of two distinct kinds of values, which code may represent various kinds of letters and numbers including, but not limited to, a representation of a base 2 number."[4]

Once we define binary code to encompass more than just a binary number, we must also adopt Chamberlain's construction of "binary code generator" to mean "a processor programmed to respond to the enabling device to generate a binary code that is different for each activation of the enabling device." Lear's proposed construction – "a processor programmed with a binary arithmetic algorithm operating on an initial binary number to generate a different binary number for each activation of the transmitter" – turns on its understanding of "binary code," as limited to a "binary number." Once we foreclose that argument, Lear's construction must fail.

The same is true as to the construction of "trinary code generator for generating a three-valued or trinary code responsive to the variable binary code." Lear's construction focuses on the conversion from a "binary number generated by the binary code generator into the first trinary code." Such a construction impermissibly limits the claim to conversion from a binary number to a trinary code. As we noted above, the claims never limit the initial binary code to

---

[4]Lear's argument that plaintiffs' definition of "binary code" and "trinary code generator" is "driven by their need to use memory to find infringement" (Lear's *Markman* Position slides, pp. 9-10) is an infringement argument, rather than a claim construction argument. We will not decide at this point if Lear's product exists in "binary code," as defined by this opinion, only in the computer memory, or if such a use of "binary code" is infringing.

a "binary number," instead leaving the term open to encompass other numerical and character languages, including trinary code. Therefore, we construe "a trinary code generator for generating a three-valued or trinary code responsive to the variable binary code" to mean "a processor programmed to generate a trinary code in response to the variable binary code."

Finally, we turn to the language "apparatus for producing a fixed code signal and for combining said fixed code signal with a rolling code signal," appearing in claim 3. In the specification's summary of the invention, the patentee defined "rolling or variable code" as a code "changed with each actuation of the transmitter" (3:15-16). Comparing the two, the patentee defined "fixed code" to "remain the same for each actuation of the transmitter" (3:16-17). As we understand the invention, the fixed code signal acts as an identifier for the receiver, and therefore, the make-up of the fixed code must remain the same for each activation. Thus, if the fixed code is 123, it must remain made up of 1, 2, and 3, such that the receiver can recover the fixed code. Such a static make-up is compared to the rolling code, which, in addition to potential encryption, changes its make-up after each activation. Based on that understanding, and the language in the specification, we find that "fixed code signal" is "a coded signal representing a fixed code generated by the processor."

Chamberlain encourages us to further define "fixed code" to include the clause "regardless of how it is later encrypted before or during the RF (radio frequency) transmission." Defendants disagree, arguing that not only must the make-up of the fixed code remain unchanging, but the representation of the make-up must remain also fixed, up until and through the transmission of the radio frequency signal. So, under defendants' construction, if the fixed code is 123, it must remain 123, and cannot ever be encrypted – for example, mirrored to read 321. Defendants state that because, "[i]n the only embodiment shown, the

same fixed code signal is generated and transmitted with each transmitter activation," the "fixed code" must remain the same in each transmission (Lear's *Markman* position slides, p. 20). First, we note that both parties' arguments anticipate an infringement dispute and should not necessarily be part of the claim construction. Therefore, we decline, at this stage, to define "fixed code" beyond "a coded signal representing a fixed code generated by the processor." We do recognize, however, that the Federal Circuit teaches us that "[a]bsent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the invention is limited to that context." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 909 (Fed.Cir.2004) (internal citations omitted). Although the patent does not specifically indicate that the fixed code may be encrypted, it does not clearly disclaim such an embodiment occurring outside of the activation of the transmitter.[5] *See* Innova/Pure Water, Inc., 381 F.3d at 1117 ("[E]ven where a patent describes only a single embodiment, claims will not be 'read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction'"). In fact, claims 4 and 17 indicate that the fixed binary code is "interleaved" or "combined" with the binary rolling code. Such claim language indicates that the radio frequency signal, which contains the "fixed code," can be altered before or during the radio frequency transmission (as long as the original fixed code can be recovered by the receiver). Therefore, at this point we will not read the preferred embodiment to limit a broader claim. Based on our understanding of "fixed code," we adopt plaintiff's construction of

---

[5] In fact, the specification connects the "fixed" nature of the "fixed code" to the "actuation of the transmitter." Lear failed to point out any instance in the claims, specifications, or prosecution history, wherein the patentee clearly disclaimed encryption of the fixed code signal before or during the radio frequency transmission.

"apparatus for producing a fixed code signal and for combining said fixed code signal with a rolling code signal" to mean "a processor programmed to 1) produce a message carrying information indicative of a non-changing code and also 2) combine that message with a message carrying information indicative of a rolling code."

## CONCLUSION

For the reasons stated above, we adopt plaintiff's constructions of disputed terms.

_____
JAMES B. MORAN
Senior Judge, U. S. District Court

_____ 11 , 2006.