

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC., <br>     Plaintiff/ <br>     Counterclaim Defendant, <br><br> and JOHNSON CONTROLS <br> INTERIORS LLC., etc., <br>     Plaintiff, <br><br> vs. <br><br> LEAR CORPORATION, et al., <br><br>     Defendants/ <br>     Counterclaim Plaintiffs. | No. 05 C 3449 |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Chamberlain Group, Inc. ("Chamberlain") and Johnson Controls Interiors, LLC ("JCI") (collectively, "plaintiffs"), brought this action against Lear Corporation ("Lear"), alleging infringement of U.S. Patent Nos. 6,154,544 ('544 patent) and 6,810,123 ('123 patent).[1] Plaintiffs now move for a preliminary injunction with respect to dependent claim 4 of the '544 patent. After a Markman[2] hearing, we construed the disputed terms in claim 4, and the claims on which it depends. Plaintiffs' motion for preliminary injunction is now ripe for determination and, for the following reasons, it is granted.

## BACKGROUND

Chamberlain sells garage door openers utilizing the patented technology described in the '544 and '132 patents. JCI is the exclusive licensee of such patented technology for use in

---

[1] Plaintiffs also named Ford Motor Company as a defendant, but the matters were settled between those parties and a dismissal order was entered on October 12, 2006.

[2] Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed.Cir.1995), aff'd 517 U.S. 370 (1996).

developing radio frequency transmitters for sale to automotive original equipment manufacturers. JCI sells transmitters under the name HomeLink®, which when installed in the visor, rear view mirror, overhead console, or another place in the interior of a vehicle, works to operate Chamberlain rolling code garage door openers. JCI's customers include General Motors, Daimler-Chrysler, Ford Motor Company, Nissan, Honda, and BMW.

Lear recently entered the market for rolling code compatible garage door opener transmitters, and has created competition for JCI. In light of such competition, plaintiffs assert that Lear's technology infringes on Chamberlain's patented technology, and that such illegal infringement is causing them irreparable harm.

A motion for preliminary injunction will succeed if plaintiffs can show (1) a reasonable likelihood of success on the merits; (2) irreparable harm should the injunction not be granted; (3) the balance of hardships weighs in favor of granting the injunction; and (4) the public interest favors injunctive relief. Purdue Pharma L.P. v. Boehringer Ingelheim GMBH, 237 F.3d 1359, 1363 (Fed.Cir.2001). The first prong – likelihood of success on the merits – requires us to determine whether plaintiffs are likely to prove that defendant infringed the '544 patent. Infringement analysis is a two-step process. We must determine the scope and meaning of the claims asserted and then compare the properly construed claims to the allegedly infringing device. Planet Bingo, LLC v. GameTech Int'l, Inc., 472 F.3d 1338, 1341 (Fed.Cir.2006) (internal citations omitted).

Based on a prior hearing and previously filed briefs, we have already dealt with the claim construction step. In Chamberlain Group, Inc. v. Lear Corp., 2006 WL 2632074 (N.D.Ill.2006) ("Chamberlain I"), we construed the following disputed terms: "binary code," "binary code generator," "trinary code generator," and "apparatus for producing a fixed code

signal and for combining said fixed code signal with a rolling code signal." Specifically, we construed "binary code" as "a code in which each code element may be either of two distinct kinds of values, which code may represent various kinds of letters and numbers including, but not limited to, a representation of a base 2 number." *Id.*, at *4. We construed "binary code generator" to mean "a processor programmed to respond to the enabling device to generate a binary code that is different for each activation of the enabling device." *Id.* We construed "trinary code generator for generating a three-valued or trinary code responsive to the variable binary code" as "a processor programmed to generate a trinary code in response to the variable binary code." *Id.* And finally, we construed "apparatus for producing a fixed code signal and for combining said fixed code signal with a rolling code signal" to mean "a processor programmed to 1) produce a message carrying information indicative of a non-changing code and also 2) combine that message with a message carrying information indicative of a rolling code." *Id.*, at *5. In Chamberlain I, we sided with plaintiffs on the major dispute over binary code, holding that the term "binary code" was not limited to binary, or base 2, numbers.

We reaffirmed our construction in analyzing defendant's motion for reconsideration in Chamberlain Group, Inc. v. Lear Corp., 2007 WL 551579 (N.D.Ill.2007) ("Chamberlain II"). Therein we clarified that while a trinary code cannot be defined as a binary code with respect to the patents-in-suit, a binary code is not limited to a binary number. In that same order we declined to alter our original constructions. Now that the claim construction is complete, plaintiffs' motion for a preliminary injunction is ripe for determination.

## DISCUSSION

The Patent Act provides that courts "may grant injunctions in accordance with the

principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283 (2001). As noted above, the four factors relevant to our decision to grant or deny a preliminary injunction are "'(1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest.'" Abbott Laboratories v. Andrx Pharmaceuticals, Inc., 473 F.3d 1196, 1200-1201 (Fed.Cir.2007) (internal citations omitted). While the test is generally a balancing test, plaintiff must prove the first two factors to be granted a preliminary injunction. See PHG Technologies, LLC v. St. John Companies, Inc., 469 F.3d 1361, 1365 (Fed.Cir. 2006); National Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed.Cir.2004). And although a preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted" (Intel Corp. V. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed.Cir.1993) (internal citations omitted)), the grant or denial of an injunction is within the sound discretion of this court. Abbott Laboratories, 452 F.3d at 1334.

We begin with analysis of whether plaintiff has satisfied the first element of the test: likelihood of success on the merits. To show such a likelihood, plaintiff "must demonstrate that 'in light of the presumptions and burdens that will inhere at trial on the merits,' [plaintiffs] will likely prove that [defendant's] product infringes the ['544] patent and that it will withstand [defendant's] challenges to the validity and enforceability of the ['544] patent." Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1374 (Fed.Cir.2006). Because defendant has not raised an issue of validity or enforceability, we focus on whether plaintiffs are likely to show that defendant's accused product infringes on Chamberlain's patented technology.

To establish infringement plaintiff must show that defendant's product meets every claim limitation either literally or under the doctrine of equivalents. Pfizer, Inc. v. Teva

Pharmaceuticals, USA, Inc., 429 F.3d 1364, 1376 (Fed.Cir.2005) (internal citations omitted).

The claim at issue is claim 4, which is dependent on claims 1 and 3. Because claim 4 is a dependent claim, plaintiffs must show that defendant's product meets the limitation of both the dependent claim, and the dependent and independent claims on which it relies.

We begin our infringement analysis with a look at the claims on which the infringement contentions rely. Claim 4 reads:

> A transmitter for sending an encrypted signal to control an actuator according to claim 3, comprising apparatus for interleaving trinary bits derived from said rolling code signal to produce a trinary interleaved fixed and rolling code signal.

Claim 3 reads:

> A transmitter for sending an encrypted signal to control an actuator according to claim 1, comprising apparatus for producing a fixed code signal and for combining said fixed code signal with a rolling code signal.

Claim 1 reads:

> A transmitter for sending an encrypted signal to control an actuator, comprising:
> [1] oscillator for generating a radio frequency oscillatory signal;
> [2] apparatus for enabling the sending of an encrypted signal;
> [3] binary code generator responsive to the enabling apparatus for generating a variable binary code, said variable code being different for each enabling by the enabling device'
> [4] trinary code generator for generating a three-valued or trinary code responsive to the variable binary code; and
> [5] transmitting apparatus for modulating the radio frequency oscillatory signal with the trinary code to produce a modulated trinary coded variable radio frequency signal for operation or control of a secure actuator.

Plaintiffs contend that in light of this court's construction of the disputed claims in the patent-in-suit, it is clear that defendant's accused product meets every limitation of '544 claims

1, 3, and 4.[3] Defendant, not surprisingly, disagrees. Lear focuses its challenges on one main argument, arguing that its product operates completely in trinary code, and therefore, does not have a variable binary code, a binary code generator, or a trinary code generator – all limitations set forth in claim 1. Defendant's opening brief also contends that its product does not generate the fixed code signal required by claims 3 and 4. We agree with plaintiffs, finding that they have a strong likelihood of success on the merits, and address each of defendant's arguments in explanation.

Defendant's argument that it operates completely in trinary code is the same argument it made at claim construction, when it attempted to limit the binary code described in patent '544 to a binary, or base 2, number. We foreclosed such an argument when we defined "binary code" to be "a code in which each code element may be either of two distinct kinds of values, which code may represent various kinds of letters and numbers including, but not limited to, a representation of a base 2 number." Chamberlain I, 2006 WL 2632074 at *4. We understand the difference between a binary code and a trinary code to be the following: a binary code consists of exactly two values (often 0 and 1) and a trinary code consists of exactly three values (often 0, 1, and 2). In Chamberlain I, we held that the binary code contained in patent '544 was not limited to base 2 numbers, and covers, among other things, trinary numbers represented in two-valued (0 and 1) binary digits ("bits"). During the Markman hearing, defendant agreed that its code was represented in 0s and 1s within the computer (see plfs' surreply, exh. 2 ("Everything in memory is stored as 1s and 0s)). We find that while such a code may actually represent a trinary number, it is still a binary code within our current

---

[3] We note that plaintiffs also contend that they would have been entitled to preliminary injunction under Lear's proposed claim construction. Because we sided with plaintiffs on claim construction, however, we need not address such a contention now.

definition of binary code. It is, in fact, a binary-coded trinary number. As long as Lear's patent contains two-valued bits of code (code made up of 0s and 1s), it contains binary codes. And, therefore, it appears very likely that under our definitions the Lear product contains binary code.[4]

If that is indeed the case, plaintiff is highly likely to prove that Lear's product also contains a binary code generator and a trinary code generator. In fact, Lear never argues that it may have a binary code and not a binary code generator and trinary code generator. Lear's product clearly generates different codes upon each activation of the enabling device. We have already determined that Lear's device likely generates binary code. Lear admits, and in fact bases its argument upon the fact that its product generates trinary code. Therefore, such codes must be generated by binary code and trinary code generators. For example, if Lear's code begins as a binary-coded trinary number, it would be generated by a binary code generator with each activation of the enabling apparatus resulting in two-valued bit codes. Then, those two-valued bit codes, which in the Lear product are trinary-coded binary numbers, must be changed into three-valued bit codes, which, in Lear's product, seemingly are trinary-coded trinary numbers. Therefore, we find that plaintiffs are likely to prove that Lear's product contains binary code, a binary code generator, and a trinary code generator.

We turn now to defendant's argument that its product does not contain a fixed code as

---

[4]Defendant cites to the deposition testimony of Bradford Farris to suggest that "it is undeniable that a three-valued code within a computer is the 'trinary code' of the '544 patent" (def's supplemental brief, at 6). Farris' deposition testimony, however, makes clear that he is speaking specifically of the preferred embodiment. We will not import limitations of the preferred embodiment into the claims. *See* <u>Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.</u>, 442 F.3d 1322, 1329 (Fed.Cir.2006) ("This court...declines to read a limitation from the written description into the claims"); <u>Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.</u>, 381 F.3d 1111, 1117 (Fed.Cir.2004) ("particular embodiments appearing in the written description will not be used to limit claim language that has broader effect"). We have already determined, in <u>Chamberlain I</u> and <u>Chamberlain II</u>, that the claims of the '544 patent include binary-coded trinary numbers within the definition of binary code.

required by claims 3 and 4. Specifically, defendant attempts to distinguish its product, asserting that "Lear's rolling code is used to encrypt a transmitter identifier to produce a variable trinary ID code which changes for each activation" (def's response at 7). Defendant's expert, Roy A. Griffin III, describes the differences between the two products with respect to the fixed code. He notes, with regard to Chamberlain's fixed code:

> In claim 3, which depends from claim 1, the transmitter additionally includes apparatus for producing a fixed code signal and for combining the fixed code signal with a rolling code signal. The '544 patent discloses that this fixed code signal is the same for every transmission. The '544 patent discloses that the apparatus of claim 3 is a software algorithm running on a microcontroller which generates a signal for transmission having a rolling code signal portion which changes with each transmission and a fixed code signal portion which is always transmitted the same way.

(Def's response, exh. F, at ¶11.)

> Griffin differentiates Lear's product with regard to the fixed code:

> Lear's Car-2-U system does not have the apparatus of claims 3 and 4 because Lear's system does not transmit a fixed code signal which stays the same in each transmission. Lear's system encrypts a transmitter identifier with a variable encrypted count value to produce a variable ID code. Lear's system then combines the variable encrypted count value with a variable ID code to generate the transmitted signal.

(*Id.*, at ¶26.).

Looking at those explanations, we view the "transmitter identifier" as the potential fixed code (*see* plfs' reply, exh. 6, at p. 107) ("The transmitter identifier is a constant"). We then note that the difference between Lear's system and Chamberlain's patent is that the transmitter identifier in Lear's product is encrypted before it is combined with the trinary count code. In light of the <u>Markman</u> arguments, we determined that Chamberlain's patent did not disclaim a fixed code signal that was encrypted before it was combined with a rolling code to result in the radio frequency transmission. We rejected defendant's position that the

make-up of the fixed code must remain unchanging, explaining that a fixed code under our definition would include, for example, a code that originally read 123 and was encrypted to read 321. Our reading of Lear's product, based primarily on defendant's own expert, shows a constant transmitter identifier that is encrypted through the use of a trinary algorithm. Although encrypted, the transmitter identifier remains constant, and therefore, is likely to fall within the scope of the fixed code suggested in patent '544. Therefore, as noted above, we find that plaintiffs are likely to succeed on the merits of their infringement claim.

We turn now to plaintiffs' claims of irreparable harm should we decline to enter a preliminary injunction. Plaintiffs' argument is threefold. First, plaintiff suggests that a strong showing of a likelihood of success on the merits creates a presumption of irreparable harm. Second, plaintiffs argue that Lear's alleged infringement has caused actual harm. Finally, plaintiffs assert that Lear's continued infringement will cause future harm and encourage additional infringement. Defendant's response fails to dispute plaintiffs' specific contentions, and instead argues that (1) plaintiffs' delay in filing its motion for a preliminary injunction precludes entry of such an order and (2) plaintiffs' harm is only speculative.

The Federal Circuit and lower courts have generally held that patent holders are entitled to a presumption of irreparable harm upon making a clear showing of validity and infringement. See Pfizer, Inc., 429 F.3d at 1381; Purdue Pharma L.P., 237 F.3d at 1363; Spinmaster, Ltd. v. Overbreak, LLC, 404 F.Supp.2d 1097, 1111 (N.D.Ill.2005); Techtronic Industries Co., Ltd. v. Chervon Holdings, Ltd., 395 F.Supp.2d 720, 736 (N.D.Ill.2005). The Techtronic court explained the rationale: "[B]ecause the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." 395 F.Supp.2d at 736 (citing

<u>Hybritech Inc. v. Abbott Laboratories</u>, 849 F.2d 1446, 1456-57 (Fed.Cir.1988)). Last year, however, the Supreme Court decided <u>eBay Inc. v. MercExchange, L.L.C.</u>, 126 S.Ct. 1837 (2006), in which it reaffirmed "that the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." 126 S.Ct. at 1841. Setting forth the boundaries of permanent injunction analysis, the Supreme Court found that the Federal Circuit had erred in its categorical rule that permanent injunctive relief will generally issue once a patentee establishes infringement and validity. *Id.* While <u>eBay</u> has yet to be completely fleshed out in the lower courts, it has been applied to preliminary, as well as permanent, injunctions (*see* <u>Erico Int'l Corp. v. Doc's Marketing, Inc.</u>, 2007 WL 108450, *7 (N.D.Ohio.2007) ("While Ebay involved a permanent injunction specifically, the Court did not limit its holding to that context; the Court's reasoning likely applies with even greater force at the preliminary injunction stage"), and has been read to limit the presumption of irreparable harm solely upon the finding of infringement. *See* <u>MyGym, LLC v. Engle</u>, 2006 WL 3524474, *11 (D.Utah 2006) (assessing a trademark infringement claim); <u>Smith & Nephew, Inc. v. Synthes (U.S.A.)</u>, 466 F.Supp.2d 978, 982 (W.D.Tenn.2006); <u>Paice LLC v. Toyota Motor Corp.</u>, 2006 WL 2385139, *4 (E.D.Tex.2006). Therefore, we turn to plaintiffs' additional arguments.

Plaintiffs suggest that they have actually been harmed by defendant's alleged infringement. Specifically, plaintiffs assert that Lear's infringement is causing market spoilation and price erosion, and has strained JCI's relationships with its customers. In support, plaintiffs filed a declaration of James E. Trainor, the director of market strategy for electronics at JCI. Therein, Mr. Trainor indicated that JCI has come under intense pricing

pressure from customers contacted by Lear, including Daimler-Chrysler, Ford Motor Company, Nissan, Honda, and BMW, indicating that such customers are using Lear's offer of sale to force JCI to lower its prices (plfs' motion, exh. 5, at ¶¶ 3-4). Trainor further asserted that "[t]he threatened diversion of sales to GM, Ford, Nissan, Honda, and BMW from JCI to Lear would be a major loss to JCI of sales (at least $132,000,000 worth of sales), market share (at least 60% of JCI's current market), and customer goodwill" (*id.*, at ¶ 8). Although such injury may be deemed "speculative," Scott A. Wright, vice-president of sales at JCI, further declared that Lear's actions have strained and will continue to strain JCI's relationship with its customers (*id.*, at exh. 9, ¶ 3), and JCI has already had to offer a lower price to its largest customer, General Motors (*id.*, at ¶ 7). Such injury is real and weighs against defendant's assertion that plaintiffs have failed to articulate any actual harm. The interest in maintaining customer relationships and exclusive distributorship weighs in favor of a finding of irreparable harm. *See* <u>Polymer Technologies, Inc. v. Bridwell</u>, 103 F.3d 970, 975-76 (Fed.Cir.1996) ("Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction. Customers may have established relationships with infringers. The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat. Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option"). *But see* <u>High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.</u>, 49 F.3d 1551, 1556-57 (Fed.Cir.1995) ("Because it does not compete with New Image or have licensees who could be injured by competition from New Image, HTMI does not run the risk of losses of sales or goodwill in the market; nor has HTMI suggested that New Image's activities have precluded

it from licensing its patent or entering the market").

Defendant does not dispute plaintiffs' contentions, nor does it offer an alternate side of the story. Defendant fails to rebut plaintiffs' assertions that it has already lost market share, its product has been a victim of price spoilation, or that competition from Lear has and will continue to weaken customer relationships. Rather, defendant pins its hopes on the assertion that plaintiffs' delay in bringing a preliminary judgment motion precludes grant of a preliminary injunction. Specifically, defendant suggests that because JCI first contacted Lear about alleged infringement on May 11, 2004, did not file suit until June 13, 2005, and failed to file its preliminary injunction motion until November 29, 2005, plaintiffs' delay indicates a lack of irreparable harm. While delay is an important factor bearing on the need for a preliminary injunction (High Tech, 49 F.3d at 1557), the period of delay is "but one circumstance that the district court must consider in the context of the totality of the circumstances." Hybritech Inc., 849 F.2d at 1457. In this case, in addition to showing actual and future harm, plaintiff persuasively argues that it was proceeding with due caution, and therefore, the delay does not outweigh plaintiffs' showing of irreparable harm to its business. *But cf.* High Tech, 49 F.3d at 1557 ("While the period of delay may not have been enough, standing alone, to demonstrate the absence of irreparable harm, it did not stand alone in this case. In addition to HTMI's delay in seeking relief, the evidence of HTMI's inactivity in the market, HTMI's apparent willingness to grant a license under its patent to New Image, the absence of any indication that money damages would be unavailable to remedy any loss suffered by HTMI, and the absence of any suggestion by HTMI as to why relief pendente lite is needed in this case, all suggest that HTMI has no compelling need for interim equitable relief").

Our determination that plaintiffs have shown irreparable harm is further bolstered by plaintiffs' unrefuted claims of future potential harm in the form of encouraging other potential infringers to enter the market, the possibility of confusion between Chamberlain's and Lear's products, and further price spoilation and loss of goodwill. Thus, we find that plaintiffs have made a sufficient showing of irreparable harm to warrant a preliminary injunction.

We turn now to the balance of hardships. Plaintiffs' showing of irreparable harm and potential future harm weighs in favor of granting the preliminary injunction. While Lear correctly suggests that withdrawing a product from the market before trial can be devastating to a company (citing Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679 (Fed.Cir.1990)), defendant completely fails to show how that would be the case for its company. Defendant failed to enter one declaration or affidavit with respect to loss of revenue, loss of sales, or loss of customer goodwill. Therefore, the balance of hardships clearly favors the grant of a preliminary injunction.

Finally, we assess whether the public interest will be served by granting a preliminary injunction. At the outset, we note that there exists a public interest in protecting rights secured by valid patents. See, e.g., Abbott Laboratories, 452 F.3d at 1348; Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 (Fed.Cir.1983). Such, however, is not always the focus of the public interest inquiry; courts should determine whether there exists some critical public interest that would be injured by the grant of preliminary injunctive relief. Hybritech Inc., 849 F.2d at 1458. While defendant points to the public interest in encouraging design-arounds, it misses the point. While the public may be served by encouraging design-arounds, whether or not defendant has successfully designed around Chamberlain's patent is an issue for infringement analysis, not public interest analysis. And since neither party indicated a

broader public interest in the underlying issue, that the public interest is served by enforcing valid patents sways this factor in favor of plaintiffs as well.

Finally, we address defendant's contention that plaintiffs must post bond under Federal Rule of Civil Procedure 65(c). Defendant correctly notes that Rule 65(c) provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." We have discretion to determine the amount of such bond, and may base our determination on evidence presented of defendant's potential lost profits, lost market share, and related costs. *See* Sanofi-Synthelabo, 470 F.3d at 1385. Defendant has failed to assert evidence of its losses, instead relying on the assessment of plaintiffs' asserted losses. Because defendant has just entered the market and does not stand to lose the same amount as plaintiffs, we enter a bond of $10,000,000.

## CONCLUSION

For the reasons stated above, we grant plaintiffs' motion for preliminary injunction.

                                                     JAMES B. MORAN
                                                     Senior Judge, U. S. District Court

March 30 , 2007.