IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC., Plaintiff/ Counterclaim Defendant, and JOHNSON CONTROLS INTERIORS LLC., etc., Plaintiff, vs. LEAR CORPORATION, et al., Defendants/ Counterclaim Plaintiffs. | No. 05 C 3449 |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Chamberlain Group, Inc. ("Chamberlain"), and Johnson Controls Interiors, LLC ("JCI") (collectively "plaintiffs") brought this action against defendant Lear Corporation ("Lear") alleging infringement of U.S. Patent Nos. 6,154,544 ('544 patent) and 6,810,123 ('123 patent), which involve technology for the secure opening and closing of moveable barriers for use in security systems such as universal garage door openers. Plaintiffs filed for a preliminary injunction, which was entered and continued pending a Markman[1] hearing and construction of the terms in dispute. In light of the construction and the parties' briefing, we granted plaintiffs' motion for preliminary injunction in an order dated March 30, 2007. Defendant now requests that this court stay the effectiveness of the preliminary injunction pending appeal to the Federal Circuit Court of Appeals. Third party General Motors Corp. ("GM") has filed a motion to intervene and join Lear's motion to stay the preliminary injunction. In the alternative, both Lear and GM request that this court increase the bond

---

[1] Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).

amount set in the March 30, 2007, order. For the reasons stated herein, we grant GM's motion to intervene and for exemption from the preliminary injunction order and deny Lear's motion to stay the effectiveness of the preliminary injunction. We deny Lear's motion to increase the bond amount to $50,000,000. Finally, we enter plaintiffs' proposed preliminary injunction order, modified to remove the language "through August 9, 2007" with regard to the GM carve out.

## BACKGROUND

Chamberlain is the patentee of the '544 and '123 patents, and seller of garage door openers under various trade names. JCI is the exclusive licensee of the '544 and '123 patents for developing radio frequency transmitters for sale to automotive original equipment manufacturers. Due to its exclusive license, JCI has been the primary seller of universal garage door openers for use in automobiles, sold under the trade name Homelink™. Lear has recently entered the market for rolling code compatible garage door opener transmitters for use in automobiles, and has been marketing its product under the trade name Car2U®. Lear has contracted with GM and has marketed to a number of other automobile manufacturers. Chamberlain asserts that Lear's product infringes on its patents and contends that Lear's lower costs and inferior product is causing price spoilation and harm to plaintiffs' reputations.

The garage door openers at issue are integrated into automobile visors and rear view mirrors, for example, and involve a transmitter and receiver that communicate with a radio frequency transmission known as a code stream. In their motion for preliminary injunction, plaintiffs assert that Lear infringed on Claim 4 of the '544 patent, which is dependent on Claims 1 and 3.

> Claim 1: A transmitter for sending an encrypted signal to control an actuator, comprising:

>oscillator for generating a radio frequency oscillatory signal;
>apparatus for enabling the sending of an encrypted signal;
>
>binary code generator responsive to the enabling apparatus for generating a variable binary code, said variable code being different for each enabling by the enabling device;
>trinary code generator for generating a three-valued or trinary code responsive to the variable binary code; and
>transmitting apparatus for modulating the radio frequency oscillatory signal with the trinary code to produce a modulated trinary coded variable radio frequency signal for operation or control of a secure actuator.

Claim 3: A transmitter for sending an encrypted signal to control an actuator according to claim 1, comprising apparatus for producing a fixed code signal and for combining said fixed code signal with a rolling code signal.

Claim 4: A transmitter for sending an encrypted signal to control an actuator according to claim 3, comprising apparatus for interleaving trinary bits derived from said fixed code signal with trinary bits derived from said rolling code signal to produce a trinary interleaved fixed and rolling code signal.

In our prior rulings we construed the terms "binary code," "binary code generator," "trinary code generator," and "apparatus for producing a fixed code signal and for combining said fixed code signal with a rolling code signal." Chamberlain Group, Inc. v. Lear Corp., 2006 WL 2632074 (N.D.Ill.2006) ("Chamberlain Markman"); Chamberlain Group, Inc. v. Lear Corp., 2007 WL 551579 (N.D.Ill.2007) ("Chamberlain reconsideration"). Using our understanding of those terms, we then compared the accused product to the terms of the patent's claims to determine whether plaintiffs showed a likelihood of successfully proving that Lear infringed on Chamberlain's patent. Chamberlain Group, Inc. v. Lear Corp., 2007 WL 1017751 (N.D.Ill.2007) ("Chamberlain preliminary injunction"). Finding a likelihood of success on the merits and a failure on defendant's part to rebut plaintiffs' claims of irreparable harm, we granted plaintiffs' motion for preliminary injunction. Lear now argues that we made two major mistakes: (1) finding that Lear's product uses a binary code, and (2) finding that Lear's product uses a binary or trinary code generator to convert the binary code

to trinary code. Further, Lear argues that the balance of hardships and the public interest weigh against the grant of a preliminary injunction. We discuss each below.

## DISCUSSION

In assessing a motion to stay a preliminary injunction pending appeal, we analyze four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" Standard Havens Products, Inc. v. Gencor Industries, Inc., 897 F.2d 511, 512 (Fed.Cir.1990) (citing Hilton v. Braunskill, 481 U.S. 770 (1987)). The Federal Circuit has indicated that each factor need not be given equal weight, and a show of substantial injury may diminish the need for a "strong showing" of success on the merits. *Id.*, at 512-13. Citing the Second Circuit, the Federal Circuit noted that the presence of irreparable injury and public interest may be sufficient to enter a stay where the applicant "'has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation....'" *Id.*, at 513 (citing Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir.1953)).

We turn first to defendant's likelihood of success on the merits. Our Markman decision and subsequent reconsideration dealt an enormous blow to defendant's case. Therein we construed the term "binary" to mean "a code in which each code element may be either of two distinct kinds of values, which code may represent various kinds of letters and numbers including, but not limited to, a representation of a base 2 number." Chamberlain Markman, 2006 WL 2632074, at *4. Our construction was based on our understanding of the meaning of "binary code" to a person of ordinary skill in the art and the intrinsic evidence of plaintiff's patent. The construction followed a three-day hearing and briefs from both parties.

Now Lear, under the guise of arguing that we misapplied our construction of "binary code" to its product, essentially argues that we erred in our construction of the term. Through use of examples and analogies, defendant's current briefs give the most specific and clear explanation of its argument. Using "1001" as an example, Lear argues that the appearance of the number is meaningless – the important consideration is "how it was determined and put together mathematically" (def's brief at 2). Lear notes that the presentation "1001" could be a binary number that represents the decimal 9, a trinary number that represents the decimal 29, or a decimal number that represents the decimal number 1001. Thus, Lear suggests, though its code is composed of 0s and 1s, which "may appear to a layperson to be binary," it is in fact always a trinary code. (*Id.*). In its reply brief, Lear explains further. It argues that each of its trinary code digits (trinary being composed of three digits, usually 0, 1 and 2) is represented by a two-bit sequence: 0 = 00, 1 = 01, and 2 = 10 (def's reply, at 5). Then, by example, the trinary number "1102" is represented as 01-01-00-10. When strung together, the code reads "01010010." (*Id.*). Defendant argues that looks can be deceiving – that just because Lear's code is composed of 0s and 1s does not mean that it is a binary code.

While Lear's presentation is significantly clearer than its previous presentations, we still decline to alter our claim construction. Through a thorough study of intrinsic and extrinsic evidence, we previously determined that the term "binary code" in plaintiff's patent covers any code composed of two distinct kinds of values – in Lear's example, 0s and 1s. Thus, defendant's code, while it may represent a trinary *number*, remains a binary *code* under our definition. The IEEE Standard Dictionary of Electrical and Electronics Terms, Sixth Edition, to which we cited in our Markman ruling, gives support to such an understanding. It defines "binary code," in one instance, as "A code that makes use of members of an alphabet containing exactly two characters, usually 0 and 1." *See* Chamberlain Markman, 2006 WL

2632074, at *4. The IEEE, in explanation, notes: "The binary number system is one of many binary codes." *See id.* It is our understanding, bolstered by plaintiff's patents and extrinsic evidence, that a trinary number system, as stored in a computer, is another one of many binary codes. As computers, "by their very nature, work on alternating electrical charges (*i.e.*, charged or uncharged)" (def's reply, at 4), a processor only operates on binary data - data that is composed of ones and zeros. Lear's code, composed of 0s and 1s (see 010110010 example above), makes use of members of an alphabet containing exactly two characters. Therefore, we also decline to alter our finding that plaintiffs are likely to succeed in showing that Lear's product infringes with respect to the binary code.

Next, we turn to defendant's argument that we failed to properly compare the claim regarding binary code generator and trinary code generator to Lear's accused device. Specifically, Lear notes that "the claim requires a binary code generator first generate a variable binary code, which then triggers the trinary code generator to generate a trinary code 'responsive to the variable binary code.'" (def's brief, at 13-14). Lear continues, "There is absolutely no evidence of record, or any suggestion that the Court considered, whether the components of Lear's product operate in the required manner or order." (*Id.*, at 14). In analyzing such an argument, we looked back at the parties' Markman presentations, memorialized in power point handouts. Chamberlain addressed Lear's specific argument. First, plaintiffs showed a trinary number processed using binary digits. Using the example 1012, the trinary number was represented in binary as 01-00-01-10. Chamberlain then explained that Lear's binary-coded trinary number (01000110) is used to generate a trinary code, which is then used to produce a modulated trinary-coded variable radio frequency signal (Chamberlain's Markman presentation, slides 58-60). Lear's Markman presentation showed a similar pattern, but showed a trinary number where Chamberlain showed a binary-coded

trinary number. That trinary number, according to Lear's <u>Markman</u> presentation, was then converted into a "trinary code" through Lear's trinary algorithm (Lear's <u>Markman</u> presentation, p. 8). Lear's expert, Roy A. Griffin III, explains:

> Lear's Car-2-U system, upon activation, retrieves a trinary count number and increments this trinary number by three using trinary arithmetic. This trinary number is then encrypted using a purely trinary algorithm which generates the trinary variable count code using the trinary count number. The resulting trinary count code is then used to encrypt a trinary transmitter identifier to produce a variable trinary ID code. The trinary count code is mixed with the variable trinary ID code, digit by digit, to produce the transmitted trinary code.

(def's reply, exh. A, at ¶22) (internal code citations omitted). We have already determined that the number identified by Griffin and in Lear's <u>Markman</u> presentation is generated as a binary code for use in the microprocessor (example: 1012 generated as 01000110). Once we make that determination, Griffin's testimony clearly shows that such a binary-coded trinary number is generated "upon activation" of the system. Chamberlain's expert, Hubert E. Dunsmore, gives further evidence that a binary code is generated upon activation of Lear's system: "Additionally, the Lear Transmitter includes a microcontroller which is programmed by software...so that in response to the actuation of the push button, the binary digits of a variable binary code, representing the binary numerical equivalent of the new trinary rolling code number, are sequentially generated (in the loop of step 3)" (plfs' motion for preliminary injunction, exh. 6, at 4-5). In comparing Griffin's and Dunsmore's testimony, it is clear that Lear's evidence does not actually refute the finding of a binary code generator, it just argues that the trinary number generated is a trinary, not binary, code. As we are (and have continually been) persuaded by plaintiffs' construction of "binary code" and "binary code generator," we find that defendant does not have a strong likelihood of proving that the first step – a binary code generator responsive to the enabling apparatus for generating a variable binary code – is absent from Lear's accused product.

Nor do we find that defendant has successfully argued absence of the next step – a trinary code generator for generating a three-valued or trinary code responsive to the variable binary code. Lear's trinary number (which we deem a binary-coded trinary number), according to Lear's own expert, is encrypted several times and interleaved with a variable trinary ID code to produce the transmitted trinary code. In our estimation, that trinary number, once a binary code, must be "produced" (or generated) into a trinary code via the trinary algorithm. In light of our findings and comparison with Lear's accused product, we do not think that defendant has shown a strong likelihood of success on the merits. Philips Electronics North America Corp. v. Contec Corp., 2004 WL 2009370, *1 (D.Del.2004) ("[T]he 'possibility of appellate de novo review of [ ] claim construction does not constitute an extraordinary circumstance to merit a stay'") (internal citations omitted); Magnesystems, Inc. v. Nikken, Inc., 1994 WL 808421, *5 (C.D.Cal.1994) (accused infringer's disagreement with court's claim construction was insufficient to show likelihood of success on the merits where the court remained unconvinced by such arguments).

Because defendant has failed to show a strong likelihood of success on the merits, it must show significant irreparable harm for us to consider entering a stay. Plaintiffs first argue that any such evidence should be excluded because "[n]ew evidence should not be considered on a motion to stay an injunction pending appeal, especially given that Lear has been in the market since May/June 2006" (plfs' response, at 5). Plaintiffs cite a string of cases in support of their argument that we may not hear new evidence regarding defendant's opposition to entry of the preliminary injunction. At the outset, we note that all three cases cited by plaintiffs (Robb Container Corp. v. Sho-Me Co., 566 F.Supp. 1143 (N.D.Ill.1983), State of N. Y. v. Nuclear Regulatory Commission, 550 F.2d 745 (2d Cir.1977), *superseded by rule on other grounds as stated in* Zervos v. Verizon New York, Inc., 252 F.3d 163 (2d Cir.2001), and Thomas

& Betts Corp. v. Panduit Corp., 1995 U.S. Dist. LEXIS 2610 (N.D.Ill.1995)) involved new evidence in cases or issues that had already been appealed to the circuit court. Such is not the case here. In Thomas & Betts, for example, defendant had previously requested a stay of the preliminary injunction, which had been denied, and had already filed a notice of appeal to the Seventh Circuit seeking an emergency stay of the district court's preliminary injunction order. Although we are under no illusion that defendant will not immediately appeal this determination to the Federal Circuit, it has not yet done so because an injunction has not yet been entered. Additionally, Federal Rule of Civil Procedure 62(c) grants us the authority, in our discretion, to "suspend, modify, restore, or grant an injunction during the pendency of the appeal" of an injunction. This is especially true in entering an order to preserve the status quo, which is the action requested by defendant in this case. *See* Thomas & Betts Corp., 1995 U.S. Dist. LEXIS 2610, at *5; Robb Container Corp., 566 F.Supp. at 1158 ("Fed.R.Civ.P. 62(c) provides for modification of an injunction pending appeal, but this rule merely expresses the inherent power of a court to maintain the status quo where it deems such action necessary"). And finally, on a practical note, upon appeal to the Federal Circuit, defendant will have the opportunity to fully present its irreparable harm case, and therefore, we see no reason to limit our consideration now.

In terms of irreparable harm, Lear argues that an injunction, even if overturned on appeal, would "effectively eliminat[e] any realistic opportunity to reenter the UGDO market" (def's brief, at 7).[2] Entry of a preliminary injunction would cause great reputational harm to defendant, which, Lear argues, would extend to products and customers outside of the universal garage door opener market. Lear asserts that entry of a preliminary injunction

---

[2]The parties use "UGDO" to stand for "universal garage door openers."

would require it to "write down the value of all of its UGDO-related capital equipment and inventory, terminate dozens of employees, and suffer significant reputational damage in the automotive industry." (*Id.*, at 7-8).

Further, Lear asserts and GM concurs, that GM will also suffer irreparable harm if a preliminary injunction is entered. Lear, in its motion, argues that should GM be forced to switch suppliers, it would face costs in the form of publication of new owner's manuals and inserts. GM, in its motion to intervene, which we grant,[3] notes the following actual and/or potential injury to GM upon entry of a preliminary injunction order: interruption of GM's assembly line production; a forced hand to obtain replacement products from JCI at a significantly higher price ($10 more per UGDO); modification of the design of its vehicles to accommodate the replacement products; modification of owner's manuals, service manuals, and other documents; inability to sell any of the affected vehicles until redesign is completed; and placements of stop orders on the garage door opener option for affected vehicles, which would result in customer dissatisfaction (GM's motion to intervene, at 4).

Plaintiffs refute Lear's irreparable harm claims, noting that Lear's well-developed company and workforce will not suffer nearly as much as Lear contends. Plaintiffs point to Lear's 2006 $17.8 billion revenue and 115,000 worldwide employees to imply that Lear's

---

[3] GM filed its motion to intervene for the limited purpose of (1) requesting the court to exempt GM from any preliminary injunction ordered, (2) joining Lear's motion to stay, and (3) petitioning the court to increase the bond required from plaintiffs for any injunction ordered. We find that GM has a right to voice its concerns in this matter and grant its motion to intervene as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2). An applicant for intervention under Rule 24(a)(2) must demonstrate that "(1) the application is timely; (2) the applicant has an 'interest' in the property or transaction which is the subject of the action; (3) disposition of the action as a practical matter may impede or impair the applicant's ability to protect that interest; and (4) no existing party adequately represents the applicant's interest." Security Ins. Co. of Hartford v. Schipporeit, Inc., 69 F.3d 1377, 1380 (7th Cir.1995). GM's motion is timely as it is made with the limited purpose of responding to the impending preliminary injunction, its interest is more than speculative and is "direct, significant, [and] legally protectable" (*see id.*), entrance of a preliminary injunction would impair GM's ability to protect its interest, and, while Lear has some overlapping interests, Lear is unable to completely protect GM's interest. *See* LG Electronics Inc. v. Q-Lity Computer Inc., 211 F.R.D. 360 (N.D.Cal. 2002).

potential loss of less than 75 jobs (*see* Fawaz Declaration, at ¶ 3), while difficult for those employees, and costs of ceasing production of its universal garage door openers, would not devastate the company.

Lear's and GM's alleged irreparable harm must be weighed against the harm to plaintiffs of staying the preliminary injunction. In Chamberlain Preliminary Injunction, we recited plaintiffs' evidence of actual and prospective harm in the form of market spoilation, price erosion, loss of reputation, and loss of customers. Defendant attempts to refute such harm, arguing that maintaining the status quo will have little effect on plaintiffs. Lear further argues that the price erosion and market spoilation claimed by JCI has yet to materialize, although Lear has been in the industry for quite some time (see def's brief, at 9) ("JCI has been successful for more than a year without an injunction (while this motion has been pending); waiting 9-12 months during an expedited appeal will cause no irreparable harm").

It is clear that all parties involved (Chamberlain, JCI, Lear, and GM) stand to suffer monetary and non-monetary losses upon the entry or stay of the preliminary injunction in this case. And while we remain convinced of our claim construction, we agree that there are contested issues going to the merits of this case that are "so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation...." Standard Havens, 897 F.2d at 513. So we balance the harms to each party. Should we enter the injunction as proposed by plaintiffs, with a 120-day carve out whereby Lear may continue to sell its allegedly infringing products to GM, Lear and GM will face substantial harms. Lear will face the potential shutdown of its UGDO operations; GM will incur great costs arising from its transition from Lear's product to JCI's product. Should we stay the injunction pending appeal, Chamberlain and JCI will face substantial harms in the form of price erosion, market spoilation, and reputational harm.

We find that GM's motion to intervene offers a workable solution. In its motion, GM seeks an exemption from any preliminary injunction that may be entered. Specifically, GM requests that the August 9, 2007, exclusion date be removed from plaintiffs' proposed preliminary injunction order to "preserve the status quo by allowing Lear to continue selling the accused product to General Motors" (GM's motion at 11). Modifying the carve out to exempt GM from an injunction will eliminate GM's potential harm and substantially limit the harm to the remaining parties. As GM is Lear's only current Car2U client, allowing Lear to continue its sales to GM should eliminate the need to shut down production or lay off employees, for example. While entry of the injunction with the carve out may still negatively impact Lear's future sales, Lear's overall injury should be far less than an injunction covering sales to GM. Entry of an injunction exempting sales to GM will also cause substantially less harm to plaintiffs than entry of a stay pending appeal. Allowing sales only to GM, while enjoining Lear from marketing its product to the broader automotive industry, should eliminate Lear's concerns of price spoilation and market erosion. Further, should the Federal Circuit determine that an injunction is the proper remedy in this case, money damages arising from the GM carve out can easily be quantified with information about the quantity of Car2U units sold to GM. Finally, we see no reason that entry of the injunction with the carve out for sales to GM would harm the public interest.

As defendant has failed to persuade us on the four-factor test enunciated in <u>Standard Havens</u>, we deny its motion for an emergency stay. Because, however, there remain substantial disputes on the merits that are fair ground for litigation, and the balance of harms weighs in favor of an exemption for GM, we grant GM's motion to intervene and for exemption from the preliminary injunction.

We turn now to the amount of the injunction bond. Originally, Lear requested a bond of $100,000,000, which we rejected, and we set the bond at $10,000,000. <u>Chamberlain Preliminary Injunction</u>, 2007 WL 1017751, at *7. Now, Lear suggests that the bond should be increased to $50,000,000 – "the amount that adequately secures Lear for the reputational damage, lost profits and the associated costs resulting from an improvidently granted injunction" (Lear's motion for in increase in the bond amount, at 2). Although plaintiffs cannot be required to pay more than the face value of the bond upon a finding that the injunction was erroneously entered (<u>Mead Johnson & Co. v. Abbott Labs.</u>, 209 F.3d 1032, 1033 (7th Cir.2000); <u>Coyne-Delany Co., Inc. v. Capital Development Bd. of State of Ill.</u>, 717 F.2d 385, 394 (7th Cir.1983)), given that the GM exemption substantially limits Lear's alleged reputational and production harms, and eliminates GM's alleged harm, we see no reason to amend the bond amount. Bond remains at $10,000,000.

## CONCLUSION

For the reasons stated above, we deny defendant's motion for an emergency stay, grant GM's motion to intervene and for exemption from the preliminary injunction order, deny Lear's motion to increase the value of the security bond, and grant plaintiffs' motion to enter preliminary injunction order. In addition, in an effort to minimize any potential harm, we promote this case for immediate appeal to the Federal Circuit Court of Appeals.

JAMES B. MORAN
Senior Judge, U. S. District Court

April 25, 2007.