**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC., and JOHNSON CONTROLS INTERIORS LLC,       )<br>)<br>)<br>) | |
|          ) | **Case No. 05 C 3449** |
| **Plaintiffs,**     ) | |
|     ) | **Magistrate Judge Morton Denlow** |
| **v.**     ) | |
|     ) | |
| **LEAR CORPORATION,**     ) | |
|     ) | |
| **Defendant.**     ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Defendant's motion for sanctions and Plaintiffs' motion to compel production of documents. Both motions have been referred to this Court from District Judge Amy J. St. Eve, as they are interrelated. Specifically, the motions arise from an incident in which a former contract employee of Defendant Lear Corporation ("Lear") emailed sensitive Lear documents to Plaintiff Johnson Controls Interiors, Inc. ("JCI"). Lear argues that JCI both attempted to bribe this potential witness and breached its duty to timely notify Lear of its possession of the documents. For its part, JCI maintains that it did nothing wrong and that Lear failed to produce the documents when it should have in the course of discovery. For the reasons explained below, this Court partially grants Lear's motion for sanctions and denies JCI's motion to compel.

## I.  BACKGROUND FACTS

These motions arise from a discovery dispute in a patent case.  In the underlying case, Plaintiffs JCI and the Chamberlain Group, Inc. ("Chamberlain") allege that Lear infringed upon their Universal Garage Door Opener ("UGDO") patents, while Lear asserts that it legally designed around the patents.

Both motions relate to events surrounding a man named Prashant Mhamunkar ("Mhamunkar").  Mhamunkar, an engineer, was a former Lear contractor through a company called Wipro who worked on programming the UGDO device, as Lear attempted to design around Plaintiffs' patents.  The present motions involve communications beginning in May 2009 between JCI and Mhamunkar, as well as documents Mhamunkar provided to JCI that may be relevant to Lear's alleged patent infringement.

### A.    Anonymous Emails Received

Mhamunkar sent an unsolicited email to JCI on May 18, 2009 from the anonymous email address "ugdo_lear@yahoo.com," calling himself "Kova Kova."  The then-anonymous Mhamunkar claimed to have "all LEAR data, design, history, algorithms etc about the garage door opener UGDO that was based upon JCI Homelink."  DX 2.[1]  JCI's Global Product Director James Trainor ("Trainor") responded via email on June 3, 2009, inviting Mhamunkar to call Trainor, but cautioning that JCI was in "active litigation" with Lear and

---

[1] "DX" refers to the exhibits attached to Lear's motion for sanctions.  "PX" refers to exhibits attached to JCI's response to the motion for sanctions.  "Pl.'s Mot. to Compel Ex." refers to exhibits attached to JCI's motion to compel.  "Def.'s Mot. to Compel Ex." refers to exhibits attached to Lear's response to JCI's motion to compel.  "Dkt." refers to docket entries in the court docket.

that if he had confidentiality obligations to Lear, they should not talk. DX 4. Trainor informed his boss, Paul Lambert ("Lambert"), about the communications, and also brought it to the attention of JCI's in-house counsel.

That summer, Mhamunkar also sent two Lear documents as attachments to anonymous emails, but JCI denies viewing the attachments at that time. On July 1 and 2, Mhamunkar emailed two apparently unsolicited files to Trainor, one entitled "Ugdo History" and the other "Executive Summary Chamberlain Code." Trainor testified in his May 12, 2010 deposition that he never opened the documents, but sent them to JCI's in-house counsel. DX 1 at 147. Sandra Quick, a JCI Vice President and General Counsel, declares that she instructed Trainor not to open the attachments, because JCI did not at that time know the identity of Kova Kova or know whether he was bound by a confidentiality agreement with some third party. She asserts that she has no recollection of seeing the documents before this Court's hearing on the present motions. Likewise, JCI's outside counsel represent that they did not view the attachments until April 18, 2010, shortly before they finally turned the documents over to Lear.

Although Lear asserts that Lambert testified to viewing the attached documents, the JCI executive only admitted to viewing the Kova Kova emails, not to opening the attachments. Lear cites deposition testimony from Lambert that he had a "recollection of" an email dated June 7, 2009, but that email precedes the July 1 and 2 transmissions containing the attachments. DX 3 at 79–80.

Although JCI and its attorneys may not have viewed the documents, the two

attachments do appear to contain privileged and confidential information. The "Executive Summary" is a one-page document on Lear letterhead dated August 31, 2004 and marked "Privileged/Confidential information prepared under direction of counsel." DX 5 at J037183. It lays out Lear's concerns that JCI/Chamberlain will change the code on their UGDO and discusses the potential value of a lawsuit against JCI for a product that may have infringed a Lear patent. The "Ugdo History" document is a one-page spreadsheet containing a "Timeline" apparently related to Lear's UGDO development. DX 4 at J037180.

Meanwhile, JCI attempted to probe the still-anonymous Mhamunkar for information about himself and what he knew. On July 6, 2009, after conferring with JCI's in-house counsel, Trainor emailed Mhamunkar to "confirm that you are not a current Lear employee and that you have honored and will honor whatever confidentiality obligations you owe Lear." DX 6 at J037196. Mhamunkar responded that he no longer worked for Lear but said nothing of his confidentiality obligations.

As time passed, it became clear that the man behind the Kova Kova emails wanted something in exchange for his information. In August 2009, Mhamunkar emailed, "I think I have interesting stuff for you. But at this point I want to see this as a win win relation, so lets be creative." DX 7 at J037243–44. Trainor responded that he wanted a "situation that is mutually beneficial to both parties" but that they should meet in person to "bridge the trust gap that exists as a result of communicating through anonymous emails and phone calls." *Id.* Trainor testified that JCI never intended to pay Mhamunkar for his information.

**B. Personal Meeting and Follow-Up**

Eventually, JCI became interested enough in the Kova Kova emails and phone calls to arrange a personal meeting. Trainor met with Mhamunkar on September 9, 2009 in Munich, Germany, detouring from a business trip in Cologne specifically to meet the potential witness. At this ninety-minute meeting, Trainor finally confirmed Mhamunkar's identity and learned that he contacted JCI because "he was involved in the development of the [UGDO] device, that he felt that it was a task . . . that he was uncomfortable executing because of the nature of the product and the manner in which it was being developed." DX 1 at 221–22. Mhamunkar also expressed interest in obtaining a Ph.D., which Trainor took to mean that Mhamunkar wanted JCI to pay for the degree in exchange for information. Of this meeting, Trainor wrote that he had reinforced JCI's unwillingness "to compromise the success of our suit by accessing information unethically or illegally." DX 9 at J037460. Around the same time, Mhamunkar also met with Patrick Nettesheim, JCI's in-house counsel in Germany.

After these meetings, Mhamunkar continued to press Trainor for "a smart way to benefit both sides," complaining that it would be "very difficult for me to get in trouble for good Karma." DX 9 at J037451. In the November 20 email that Lear points to as JCI's offer of a bribe, Trainor responded to Mhamunkar,

> One point I would like to reinforce is that Johnson Controls has recently been awarded grant monies in support of our hybrid battery initiative, which in our discussion in Munich, you expressed interest in. We have and will continue to have significant opportunities within our company related to this new market segment for qualified candidates, both in the US and Germany.

> Additionally, one of the benefits Johnson Controls provides its entire global

staff is tuition reimbursement.

Again, we would certainly provide you with independent legal representation related to the current litigation should you desire.

*Id.* at J037448.

Mhamunkar apparently took Trainor's email as an offer and replied with a counteroffer of his own.  On December 15, he wrote,

[Y]ou are willing to give me an eng position, and there is education rembourstment, the prob here is that I don't want that since I have to study full time and have no problem with the tuition.  So still there is one possibility: You offer me a position that I'm willing to take but I will use this time and money for my studies . . . and in exchance and gratitude I will provide you with the result of my research that will probably take 3.5 years.

*Id.* at J037447.

Trainor's response, however, firmly refused Mhamunkar's proposal.  He wrote, "[W]e've always been very clear that JCI will not provide you with any incentive or other inducement to provide evidence in this case," emphasizing that JCI would not "provide any type of job or tuition benefits . . . for you to testify on our behalf."  *Id.* at J037445.  He added, "[A]s to opportunities at JCI, we are happy to discuss them generally as we would with any other qualified candidate," but concluded that to avoid an appearance of impropriety, JCI could not "discuss specifics or make any offers while we are working through the subpoena and your testimony."  *Id.*  Trainor also testified that he never invited Mhamunkar to apply at JCI.

In January, Mhamunkar replied that he would only testify "for free" if JCI could arrange a way to take his testimony anonymously.  DX 9 at J037445.  He claimed that he

would still like to help JCI but that Trainor's "clarification that [Mhamunkar] get nothing" meant an "only you win" deal for JCI. *Id.* JCI did not respond to this email, and the communication with Mhamunkar dropped off after January 2010. Despite an outstanding document request,[2] JCI did not notify Lear of the emails or the documents from Mhamunkar until May 2010. Some were not disclosed until May 12, 2010, the morning of Trainor's deposition.

## C. Attempts to Subpoena Mhamunkar and His Former Employer

JCI attempted to serve Mhamunkar with a subpoena to produce documents and appear for a deposition in December 2009, to which Lear objected. On March 26, 2010, JCI gave notice of a telephone deposition, but Lear objected again. JCI sought an international deposition, as Mhamunkar was then in India, which Judge St. Eve denied as untimely. Dkt. 570.

On April 16, 2010, JCI served a subpoena on Wipro seeking information about Mhamunkar's work for Lear. On June 15, 2010, Mhamunkar emailed nine documents directly to Trainor and Nettesheim, apparently in response to the subpoena, which they forwarded to JCI's outside counsel without opening. JCI's counsel reviewed the documents and the next day communicated to Mhamunkar's counsel that future documents responsive

---

[2] Although none of the document requests in this case have been reproduced as attachments to this motion, Lear noted at oral argument that Lear "had an outstanding document request well before the summer of 2009 that captured these documents." Tr. of Proceedings 10/7/2010, at 16. JCI does not appear to contest this assertion. In light of the extensive discovery in this case, the Court finds it inconceivable that the emails were not covered by an outstanding document production request.

to the subpoena should be forwarded to JCI's counsel.  In the same email, JCI's counsel notified Lear's counsel regarding receipt of the documents, some of which appeared to contain confidential Lear information.  Mhamunkar subsequently sent three more sets of documents, the last one on June 23, 2010.  Contentious exchanges between the attorneys show that JCI forwarded the documents to Lear and destroyed their copies, but that JCI's counsel retained copies to ensure that *in camera* inspection would be possible.

## D.    Dueling Motions

After learning of JCI's communications with Mhamunkar, Lear attempted to investigate how the documents were leaked or stolen. In another odd twist to the story, this investigation raised doubts about the witness's true identity.  Not surprisingly, Mhamunkar himself denied sending documents to JCI.  But other evidence seemed to substantiate his denial.  Wipro, the Lear contractor for whom Mhamunkar worked, advised Lear that a forensic review of the programmer's work and personal computers revealed no evidence of the Kova Kova emails.  And Mhamunkar's passport apparently reveals no travel to Germany in 2009 or 2010.

The attorneys had a meet and confer sometime in July 2010, and Lear produced a privilege log on July 30, 2010 naming seven of the documents sent by Mhamunkar, though the list of documents sent exceeds 200.  Lear's counsel has declared that Lear produced all responsive and non-privileged documents it had in its possession related to Mhamunkar's work on Lear's UGDO project, and that Wipro has done a search and possesses no documents related to Mhamunkar's work on the project. JCI asserts that the documents Lear

has produced have been "very limited . . . with few documents relating to technical work on the Lear software . . . ." Pl.'s Mot. to Compel at 5.

Ultimately, Lear filed a motion for sanctions against JCI, arguing that its conduct in the Mhamunkar affair amounted to severe misconduct and requesting that the Court dismiss JCI's entire complaint as punishment. In the alternative, Lear also requests lesser sanctions, such as (1) striking JCI's claims of willful infringement; (2) enjoining Plaintiffs from offering any testimony from Mhamunkar; (3) ordering JCI to pay Lear's costs and fees for this motion, and (4) enjoining Plaintiffs from further attempts to elicit confidential and privileged information from former Lear contractors or employees. Lear does not argue that Chamberlain, the other plaintiff, engaged in sanctionable activity, but does request that any prohibition on contacting or taking testimony from Mhamunkar should extend to Chamberlain.

For its part, JCI moved to compel Lear to produce the documents sent by Mhamunkar that Lear has not already produced or included in the privilege log. Even if some of the Mhamunkar documents were stolen, JCI argues Lear should have retained copies of its own documents related to Mhamunkar's work and should produce those or be sanctioned for spoliation of evidence. On October 7, the Court held oral argument on both motions.

## II. LEGAL STANDARDS

A court may issue sanctions against a party who violates the rules of discovery in order to penalize the wrongdoer and to deter future misconduct. *See Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003). Federal Rule of Civil Procedure 37(c)(1) states, "If a party

fails to provide information . . . as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In addition, or alternatively, the Court may impose other sanctions up to and including dismissal of the action. Fed. R. Civ. P. 37(b)(2), (c)(1). The Court also has inherent power aside from Rule 37 to impose sanctions, including dismissal, for bad faith conduct. *Rhodes v. LaSalle Bank, N.A.*, No. 02 C 2059, 2005 WL 281221, at *2 (N.D. Ill. Feb. 1, 2005).

Discovery sanctions are only called for where willfulness, bad faith, or fault is shown. *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992). "Bad faith" is characterized by intentional or reckless misconduct, "fault" by the degree of reasonableness of the conduct. *Id.* Additional considerations include whether and to what extent the opposing party was prejudiced by the improper conduct and the proportionality of the sanction to the conduct. *Rhodes*, 2005 WL 281221, at *2.

Dismissal with prejudice is a "harsh sanction which should usually be employed only in extreme situations." *Marrocco*, 966 F.2d at 224 (internal citations omitted). Clear and convincing evidence has been the traditional standard required by the Seventh Circuit for ordering dismissal as a sanction, although it is unclear whether that is still the case. *Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 564 (7th Cir. 2007) (noting that heightened burdens of proof do not generally apply unless required by statute or the Constitution). Cases where the sanction of dismissal has been ordered involve such abuses of the judicial process as a party knowingly giving perjurious answers in a deposition and interrogatories; stealing

proprietary information; or altering, destroying, or failing to produce discoverable evidence that the party knows is relevant. *Rhodes*, 2005 WL 281221, at *3 (collecting cases). Dismissal may be a disproportionate sanction where there was only "a single act of violative conduct." *Ladien v. Astrachan*, 128 F.3d 1051, 1057 (7th Cir. 1997).

## III.  DISCUSSION

### A.  JCI Failed to Timely Disclose Its Receipt of Lear's Confidential Documents But Did Not Otherwise Act in a Sanctionable Manner.

Lear argues that JCI engaged in sanctionable misconduct by (1) soliciting Mhamunkar for confidential or privileged information; (2) offering Mhamunkar inducements for the information; (3) failing to disclose its correspondence with Mhamunkar until May 2010; and (4) providing false testimony when Trainor stated in his deposition that he never viewed the documents sent by Mhamunkar.

## 1.     JCI Did Not Solicit Privileged or Confidential Information from Mhamunkar.

The Court does not find that JCI solicited privileged or confidential information from Mhamunkar, although the issue is a bit of a close call.   On one hand, JCI received correspondence and two documents from an individual purporting to have knowledge of the UGDO device after this litigation had been proceeding for four years.   JCI confirmed Mhamunkar's identity in September 2009 as someone who indeed had worked at Lear.   JCI, and its counsel, would have at that point known that Mhamunkar may have had sensitive Lear information, yet it continued to pursue him.

On the other hand, Trainor's and Mhamunkar's correspondence ultimately shows nothing more than attempts to find out what kind of information Mhamunkar might actually possess and what his motivations were for coming forward with it.   JCI never requested that Mhamunkar send them documents they knew to be confidential or privileged.   Moreover, Trainor repeatedly warned Mhamunkar that he and JCI could not violate any ethical or confidentiality agreements Mhamunkar had with Lear.   Without more, this evidence does not establish that JCI was trying to solicit confidential information from Mhamunkar.

## 2.     JCI Breached Its Duty to Timely Disclose Its Receipt of Privileged or Confidential Documents.

Although JCI may not have solicited the documents, JCI had a duty to notify Lear of the email attachments it received from Mhamunkar within a reasonable time after receiving them on July 1 and 2.   To begin with, JCI had a duty to timely produce the documents under Lear's outstanding document request.   *See* Fed. R. Civ. P. 26(e).   Its failure to do so is in

itself sanctionable. *See* Fed. R. Civ. P. 37(c)(1).

That said, the parties address the issue principally in terms of whether the situation triggered an ethical duty to disclose the receipt of privileged or confidential documents, so the Court will do likewise. JCI argues that there are no Northern District of Illinois, American Bar Association, or Illinois rules of conduct that explicitly spell out this duty. But case law also informs an attorney's ethical duties in the discovery process. *See Burt Hill, Inc. v. Hassan*, No. Civ.A. 09-1285, 2010 WL 419433, at *3 (W.D. Pa. Jan. 29, 2010) (just because the Pennsylvania and ABA rules of conduct do not apply does not mean lawyers can "throw up their hands and conclude that nothing can or should be done to protect or ameliorate the document owner's privilege and confidentiality interests"); *Maldonado v. New Jersey*, 225 F.R.D. 120, 138–39 (D.N.J. 2004) (in considering disqualification of counsel, court looked to but was not bound by opinions of the ABA and the New Jersey Ethics Committees); ABA Formal Ethics Op. 06-440 (May 13, 2006) ("[T]he Rules do not exhaust the moral and ethical considerations that should inform a lawyer['s conduct].").

JCI correctly notes that the ABA has withdrawn Formal Opinion 94-382, which spoke to ethical duties surrounding receipt of unsolicited confidential documents. But ABA Model Rule of Professional Conduct 4.4(b) is still in effect and states: "A lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was *inadvertently* sent shall promptly notify the sender." (emphasis added). Many courts, this Court included, fail to see why this same duty to disclose should cease where confidential documents are sent intentionally and without permission. *See Burt*

-13-

*Hill*, 2010 WL 419433, at \*4–5 (collecting cases).  If anything, the duty to disclose should be stricter when a party obtains the documents outside legitimate discovery procedures.

Even in the absence of privilege, this duty to disclose extends to receipt of proprietary or confidential documents.  *See id.* at \*5  n.6 (collecting cases).  This is so because it is generally "an improper litigation tactic to use a disgruntled employee to secretly obtain non-public internal business documents from an opposing party." *Glynn v. EDO Corp.*, No. JFM-07-01660, 2010 WL 3294347, at \*5 (D. Md. Aug. 20, 2010); *see also Knitting Fever, Inc. v. Coats Holding Ltd.*, No. 05CV1065, 2005 WL 3050299, at \*2–4 (E.D.N.Y. Nov. 14, 2005) (party receiving privileged or "otherwise confidential" documents from an anonymous source had a duty to notify opposing counsel).

Here, JCI should have promptly disclosed its receipt of documents from Mhamunkar. Although JCI may not have realized that the documents were privileged if it did not open them, its correspondence with Mhamunkar reveals that the company suspected from the outset that the documents were confidential.  JCI therefore had a duty to promptly disclose the situation to Lear, a duty which it could not circumvent simply by sitting on the documents.  JCI breached this duty, so sanctions are warranted.

-14-

### 3. JCI Did Not Attempt to Bribe Mhamunkar.

Turning to Lear's most serious allegations, the evidence does not establish that JCI attempted to bribe Mhamunkar, although some of the correspondence between Trainor and Mhamunkar is troubling. On its face, Trainor's November 20, 2009 email appears highly incriminating. While the email avoids making an explicit offer, it notes with a wink and a nod that JCI has career opportunities and tuition assistance for people like Mhamunkar. The message thus could be read as suggesting that JCI would look out for Mhamunkar's career and financial interests should he assist JCI's case.

In the context of the larger exchange, however, this Court finds that Trainor stopped short of offering a bribe. Mhamunkar approached JCI initially, and while JCI pursued him to figure out what information he might have, Trainor also repeatedly communicated that the company could not provide compensation. To the extent the November 2009 email can be construed as an inducement, Trainor clarified in his next email that JCI could not offer Mhamunkar employment or tuition reimbursement for his information. If Trainor actually intended to bribe Mhamunkar, it made little sense for Trainor to put forth the inducement only to cut short Mhamunkar's hopes in his next email.

Also, the Court finds nothing improper about JCI's offer to provide Mhamunkar with counsel. The Northern District's Local Rules allow reimbursing witnesses for "expenses reasonably incurred in attending or testifying." N.D. Ill. L.R. 83.53.3(a)(15). Here, an attorney for Mhamunkar would have merely facilitated his giving of testimony, rather than profiting the witness personally. Thus, much like reimbursing a witness for travel expenses

or accommodations, offering counsel to Mhamunkar fits within an exception to the rule against compensating a witness.

**4.      No Evidence Exists that Trainor Testified Falsely.**

Finally, the Court does not find that Trainor provided false deposition testimony. Trainor testified that he did not open the attachments in Mhamunkar's emails, and Lear argues that Lambert's deposition testimony contradicts Trainor on the point.   But the transcript of Lambert's deposition does not support Lear's argument.   Lear maintains that Lambert admitted to recognizing the documents attached to Mhamunkar's emails, but as discussed above, Lambert only admitted recognizing certain email correspondence, not the attached documents.  In fact, the email that Lambert admitted to recognizing was dated June 7, 2009, almost a month before Trainor received the attachments in question.  Thus, Lear's "false testimony" argument lacks merit.

**B.      Sanctions Less than Dismissal Are Warranted.**

Given these conclusions, the Court must determine appropriate sanctions for JCI's failure to disclose receipt of documents from Mhamunkar.  First, this case does not involve the sort of egregious conduct that would warrant dismissal of some or all of the complaint. Cases in which dismissal is used typically involve acts of extreme bad faith on the order of perjurious testimony or intentional destruction of evidence. *See Rhodes*, 2005 WL 281221, at *3.  In contrast, JCI ultimately produced the Kova Kova emails and attachments of its own accord shortly after it finally reviewed the attachments.

Exclusion of evidence is a more appropriate sanction, and is indeed presumed in the

case of a failure to disclose under Rule 37(c)(1). Here, excluding the tainted evidence means not only barring testimony from Mhamunkar but also ensuring that JCI does not benefit from its receipt of documents from Mhamunkar. Had JCI timely notified Lear of the Kova Kova emails, perhaps Lear could have taken further steps to ensure that Wipro and Mhamunkar had fulfilled their duties to produce documents, and if not, JCI could have sought court intervention before the discovery period closed. But JCI tarried, and now it must lie in the bed it has made. The Court bars Mhamunkar from testifying in this case, bars JCI from further contacting Mhamunkar in connection with this case, and denies JCI's motion to compel.[3] JCI may nevertheless use those of the Mhamunkar documents that Lear has already produced in the course of discovery. It should go without saying that JCI shall promptly notify Lear of any further communications received from Mhamunkar.

Of course, excluding evidence may not amount to much of a sanction in this case, given that Judge St. Eve has already foreclosed the possibility of deposing Mhamunkar. Yet JCI has made necessary an immense expenditure of resources, both this Court's and Lear's, that could have been largely preserved had JCI acted as it should have. For that reason, the Court also orders JCI to pay all attorney's fees expended by Lear in pursuing its motion for

---

[3] The Court also notes that JCI's motion to compel could be denied on its merits. Lear's counsel has filed declarations and represented in open court that it has produced all non-privileged Kova Kova documents that it could identify as Lear documents. This Court accepts those representations, just as it accepts JCI's representations about when its people first opened the Kova Kova attachments, and therefore finds that Lear has fulfilled any duty it had to produce documents appearing in the Kova Kova collection. As for the documents that Lear claims not to recognize, the Court is not about to use the mysterious and anonymous Kova Kova emails as evidence of spoliation.

sanctions and opposing JCI's motion to compel.

## IV.  CONCLUSION

For the reasons set forth in this opinion, Lear's motion for sanctions is granted in part and denied in part.  The Court bars Mhamunkar from testifying in this case and bars JCI from further contacting Mhamunkar in connection with this case.  JCI's motion to compel is denied.  JCI shall reimburse Lear for all attorney's fees expended in pursuing Lear's motion for sanctions and opposing JCI's motion to compel.  The parties are encouraged to meet and seek a resolution of the amount of fees to be paid.  Otherwise, the amount shall be determined at the conclusion of the case.


SO ORDERED THIS 8th DAY OF NOVEMBER, 2010.

_____

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Karl Regan Fink
John F. Flannery
Joseph Frank Marinelli
Rudy I. Kratz
Fitch, Even, Tabin & Flannery
120 South LaSalle Street
Suite 1600
Chicago, IL 60603

Counsel for the Chamberlain Group, Inc.


Ruffin B. Cordell
Fish & Richardson P.C.
1425 K Street N.W.
11th Floor
Washington, DC 20005

Tamara D. Fraizer
Katherine Kelly Lutton
Scott A. Penner
Fish & Richardson P.C.
500 Arguello Street
Suite 500
Redwood City, CA 94063

Frederic R. Klein
Frederick H. Cohen
Goldberg Kohn Ltd.
Mid-Continental Plaza
55 East Monroe Street #3300
Chicago, IL 60603

Counsel for Johnson Controls Interiors,
LLC


Kimball Richard Anderson

Samuel Mendenhall
Imron T. Aly
Kathleen B. Barry
Ivan Michael Poullaos
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601

Frank A. Angileri
Thomas A. Lewry
Brooks Kushman P.C.
1000 Town Center
22nd Floor
Southfield, MI 48075

Counsel for Lear Corp.