**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE CHAMBERLAIN GROUP, INC. and JOHNSON CONTROLS INTERIORS L.L.C., | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 05 CV 3449 |
| v. | ) ) | Hon. Amy J. St. Eve |
| LEAR CORPORATION, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Patentee The Chamberlain Group, Inc. ("Chamberlain"), and its exclusive licensee Johnson Controls Interiors, L.L.C. ("JCI"), filed suit against Lear Corporation in 2005, alleging that Lear's Car2U® product infringed U.S. Patent Nos. 6,154,544 and 6,810,123. (R. 1.) On August 19, 2008, Plaintiffs filed their second amended complaint, alleging infringement of U.S. Patent No. 7,412,056, in addition to the '544 and '123 patents. (R. 270.) On July 7, 2009, Lear filed a petition for bankruptcy, which led the Court to stay the case. (R. 358; R. 359.) The Court lifted the stay on November 19, 2009. (R. 366.) On September 10, 2010, Lear filed a motion for partial summary judgment on the accrual date of Plaintiff's alleged damages. (R. 655.) Lear contends that all of Plaintiffs' claims arise out of conduct that occurred prior to its bankruptcy filing. (R. 656.) Even though it concedes that many sales occurred post-reorganization, Lear argues that, as a matter of law, damages accrue from the first act of alleged infringement, which indisputably preceded the bankruptcy petition. (*Id.*; R. 757.)

Although it is true that damages accrue from the first act of infringement, Plaintiffs are correct that distinct acts of infringement give rise to distinct rights to damages. Lear entered into a variety of pre-bankruptcy-petition agreements ("the supply agreements") with General Motors ("GM") and Ford Motor Company ("Ford"). Plaintiffs allege that these agreements constitute infringing offers to sell. (R. 715 at 10, 14; R. 720 at 4.) There is no dispute, however, that certain of the actual sales made pursuant to these agreements took place post-bankruptcy. Even if they constituted infringing offers for sale, the supply agreements did not subsume all later acts of alleged infringement that occurred when Lear later sold its Car2U® product to GM and Ford. The law does not support Lear's contention that an initial act of infringement encapsulates all further infringing behavior, such that any and all damages that result from later acts are deemed to flow from the first instance of infringement. For that reason and others explained below, the Court denies Defendant's motion.

## BACKGROUND

The Court assumes familiarity with the case, including its recent Memorandum Opinion and Order of November 24, 2010. (R. 810.)

On September 10, 2010, Lear filed a motion for partial summary judgment on the accrual date of Plaintiff's alleged damages. (R. 655.) Defendant points to its bankruptcy filing of July 7, 2009, contending that all of the claims that Plaintiffs bring against it arise from conduct that preceded that date. Lear thus argues that all acts of infringement leveled against it are subject to the plan of reorganization approved by the bankruptcy court. (R. 656 at 4.) Lear focuses on what it alternately refers to as "pre-petition" and "life of the program" contracts that it entered into with GM and Ford. (*Id.*) Plaintiffs dispute the characterization of these agreements

as "contracts," and observe that Lear has failed to cite documents in support of its motion for partial summary judgment that establish the terms and conditions of those agreements. (R. 720 at 3-6.) Nevertheless, Plaintiffs do not dispute that GM and Lear entered into a variety of supply agreements (however one might legally characterize them) on dates ranging from November 3, 2005, to before April 2007, and that those agreements predate the date of Lear's bankruptcy petition. (R. 720 at 3-4.) Nor do the parties dispute, however, that certain of those agreements entail program dates that extend beyond July 7, 2009—the date of the bankruptcy petition. (*Id.*)

The parties similarly agree that Lear and Ford entered into a number of supply agreements between April 14, 2009, and May 20, 2009, all of which preceded the filing of the bankruptcy petition. (R. 720 at 5-6.) There is no dispute that these agreements involve program dates extending from June 30, 2012, to January 31, 2013. (*Id.*)

Lear's 10-K filing for 2009 characterized such supply agreements as "purchase orders," which the company receives from its customers on an annual basis. (R. 758 at 4, 12.) Such orders "provide[] the annual terms, including pricing, related to a particular vehicle model," but they "do not specify quantities." (*Id.*) That filing also provides that Lear recognizes "revenue based on the pricing terms included in [its] annual purchasers orders as [its] products are shipped to [its] customers." (*Id.*) Furthermore, those supply agreements "generally may be terminated by our customers at any time." (*Id.*)

On the basis of these undisputed facts, "Lear seeks partial summary judgment as a matter of law that the alleged patent infringement damages in this case accrued from the dates that GM and Ford awarded Lear the Pre-Petition Contracts to sell the allegedly infringing product." (R. 656 at 4-5.) For reasons explained below, the Court denies the motion.

3

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, courts must review "facts . . . in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted); *see also* Fed. R. Civ. P. 56(e).

**ANALYSIS**

**I.    Although Damages Do Accrue from the First Act of Infringement, Distinct Acts of Infringement Give Rise to Distinct Claims for Damages**

Lear observes that its supply agreements with GM and Ford "constitute . . . offer[s] for sale under traditional contract law" and points out that those offers predate Lear's filing for bankruptcy on July 7, 2009. (R. 656 at 9-10.) Plaintiffs agree with this characterization. (R. 715 at 14 ("The issue here, however, is not whether Lear's first act of infringement occurred prior to the date it filed for bankruptcy. It clearly did.").) Defendant argues that these undisputed facts demonstrate that any patent-infringement damages for which it is allegedly

liable necessarily accrue from the date of the supply contracts, which precedes the bankruptcy filing. (R. 656 at 4-5.) To prevail in this argument, Lear must demonstrate that the evidence, viewed in the light most favorable to Plaintiffs, reveals undisputed facts that establish, as a matter of law, that all damages accrue from the dates that GM and Ford awarded Lear the relevant supply agreements.

First, the evidence must establish that, in the event that the jury determines that Lear's Car2U® product infringes the '544, '123, or '056 patents, the "offers to sell" inherent in the supply agreements would in themselves constitute acts of infringement. Second, Lear must establish that any subsequent deliveries of the Car2U® product are not independent acts of infringement, but are subsumed within the earlier supply agreements themselves. One way Defendant might establish this is by demonstrating that the supply agreements constitute "sales" as a matter of law, such that the subsequent production and delivery of the Car2U® products did not represent distinct "sales." Alternatively, Defendant could seek to demonstrate that any acts of infringement that take place subsequent to the supply agreements give rise to damages that are coterminous with those that arise from the agreements themselves. Lear, however, cannot make either of these showings.

The first question is whether the supply agreements constitute potential acts of infringement in themselves, or whether their infringing quality is contingent on later sales. The parties agree that the supply agreements amount to offers for sale. (R. 656 at 10; R. 715 at 10.) Although there is some limited support for the proposition that a naked offer for sale does not in itself amount to an act of patent infringement that gives rise to an action for damages, the Court agrees with the majority of courts that "an unauthorized 'offer to sell' a patented invention

within the United States creates a separate cause of action for patent infringement." *Wesley Jesson Corp. v. Bausch & Lomb, Inc.*, 256 F. Supp. 2d 228, 233 (D. Del. 2003) (citing *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1378-79 (Fed. Cir. 1998)); *see also CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 667 F. Supp. 2d 29, 38 n.6 (D.D.C. 2009) ("While there is authority to the contrary, the Court finds that an 'offer to sell' within the United States is an independent infringing act and does not require a further infringing act; i.e. an actual sale within the United States, to be actionable"). *But cf.* Thomas L. Irving & Stacy D. Lewis, *Proving a Date of Invention and Infringement After GATT/TRIPS*, 22 AIPLA Q.J. 309, 352 (1994) ("The main consequence of requiring an actual sale during the patent term in order to make the offer for sale an act of infringement appears to be that the date of infringement will reach back to the date of the original offer."). Because an offer to sell can give rise to a cause of action for patent infringement, "[t]he patent holder no longer has to wait for an actual infringing sale before filing suit." *Quality Tubing, Inc. v. Precision Tube Holdings Corp.*, 75 F. Supp. 2d 613, 624 (S.D. Tex. 1999).

If the jury determines that Lear's Car2U® product infringes one or all of the asserted patents, then the offers to sell entailed by the supply agreements constitute acts of infringement that give rise to damages. As both parties agree, such infringement would predate Lear's bankruptcy filing and would be subject to the reorganization plan. Defendant argues further, however, that the potential damages for the formal deliveries and payment that took place after the bankruptcy petition are subsumed within the first act of infringement. (R. 656 at 10-11.) Lear's argument is premised on the well-established principle that damages accrue from the first act of infringement. (R. 656 at 11(citing *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870

(Fed. Cir. 1993); *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988) (*overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004)).) Lear's position, however, assumes that the relevant acts of purported infringement are limited to the supply agreements that Defendant entered into with GM and Ford before it later filed for bankruptcy. Lear's argument would be precluded if subsequent sales, even if made pursuant to those supply agreements, constitute discrete acts of (alleged) infringement that give rise to independent claims for damages. In other words, multiple acts of alleged infringement may exist that are independent of one another. As a result, the fact that some potentially infringing acts predate Lear's bankruptcy filing does not mean that they all do.

As Plaintiffs correctly point out, the Federal Circuit's "case law clearly states that each act of patent infringement gives rise to a separate cause of action." *Hazelquist v. Guchi Moochie Tackle Co., Inc.*, 437 F.3d 1178, 1180 (Fed. Cir. 2006); *see also E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions, L.L.C.*, 525 F.3d 1353, 1362 (Fed. Cir. 2008). *Hazelquist* is instructive to the case at hand.

Mr. Hazelquist was a patentee who brought an infringement action against Guchi Moochie Tackle Company and its sole owner, Mr. Yamaguchi. *Hazelquist*, 437 F.3d at 1179. After the district court granted default against Guchi Moochie, Mr. Yamaguchi filed for Chapter 7 bankruptcy and ultimately obtained a discharge of his debts. *Id.* The district court then ordered the patentee to show cause why the case should not be dismissed in light of the fact "that the instant case was included in the debts and liabilities subject to discharge."*Id.* Mr. Hazelquist countered that the defendant had continued to infringe his patent after the bankruptcy discharge,

7

which Mr. Yamaguchi did not deny. *Id.* at 1179-80. The district court deemed this to be an insufficient basis for allowing the case to continue, and thus dismissed the lawsuit. *Id.*

The Federal Circuit reversed, holding that "a discharge in bankruptcy . . . does not act as an injunction against a plaintiff asserting a claim for . . . a cause of action that arose . . . after the date of bankruptcy discharge." *Id.* at 1180. The court explained that "each act of patent infringement gives rise to a separate cause of action" and held that, "to the extent that Mr. Yamaguchi has engaged in infringing activities since the discharge of his debts, each of those infringing activities gives rise to a cause of action that dates from the moment of infringement, after the discharge of Mr. Yamaguchi's debts." *Id.* at 1180-81.

Defendant is correct that *Hazelquist* does not necessarily determine the outcome of the motion presently before the Court, as "the post-petition sales of fishing lures were not made pursuant to pre-petition contracts for sale." (R. 757 at 7.) Nevertheless, to the extent that Lear's post-bankruptcy sales to GM and Ford constitute infringing activities giving rise to causes of action that are independent of earlier acts of infringement, *Hazelquist* requires that the Court deny Defendant's motion for partial summary judgment. *See also In re Spansion, Inc.*, 418 B.R. 84, 92 (Bkrtcy. D. Del. 2009) ("If an injury continues after the stay is no longer in effect, courts have recognized a cause of action for post-discharge or post-confirmation acts of infringement.") (*order vacated by Samsung Elecs. Co. v. Ad Hoc Consortium of Floating Rate Noteholders*, 2010 WL 2636115 (D. Del. June 29, 2010)).

The determinative question, then, is whether Lear's entering into supply agreements with GM and Ford, and later making sales pursuant to those agreements, constitute separate acts of alleged infringement. As discussed in the next section, the answer is yes.

8

**II. Lear's Actual Sales to GM and Ford Constitute Independent Acts of Infringement that Are Separate from the Offers to Sell Contained in the Supply Agreements**

Lear does not argue that the supply agreements it entered into with GM and Ford constitute "sales" for the purpose of 35 U.S.C. § 271. (R. 656 at *passim*.) Instead, Defendant submits that the supply agreements are "offers for sale" that constitute acts of infringement, which give rise to their own causes of action. (R. 656 at 10.) Defendant also characterizes those agreements as legally enforceable "contracts." (*Id.*) The question whether the supply agreements constitute enforceable contracts, however, is distinct from whether GM's and Ford's subsequent purchases of Lear's Car2U® products pursuant to those agreements constitute separate "sales."[1]

Lear fails to offer evidence demonstrating that GM's and Ford's post-bankruptcy purchases do not constitute separate sales. (R. 656 at *passim*.) In contrast, Plaintiffs point to Lear's 30(b)(6) deposition testimony that "an award does not equal a sale" and that "[a] unit of sale would be equal to a unit shipped." (R. 715 at 11-12.) Chamberlain and JCI also observe that Defendant's 2009 10-K filing provided that Lear "recognize[s] revenue . . . as [its] products are shipped to [its] customers." (*Id.* at 12.) Plaintiffs further observe that Todd Glaspie, Defendant's Director of Business Planning and Analysis, testified that Lear allocated royalty payments based on the date that the Car2U® products were sold, "[w]hich is the same thing as the date it was shipped." (*Id.* at 13.) In its reply, Lear dismisses the relevance of Plaintiffs' proffered evidence on the ground that the manner in which the company recognizes revenue for accounting purposes "is not relevant to the legal issue of when damages accrue under the patent

---

[1] Lear does dispute, however, that the shipments of its Car2U® products constitute sales. (R. 758 at 3.) For reasons explained below, the Court rejects this argument.

9

laws." (R. 757 at 12.) Lear fails to offer any evidence, however, that GM's and Ford's actual purchases are sales that are not separate from the supply agreements.

Defendant correctly points out that "when a sale occurred is a legal question," though that legal determination obviously depends on the relevant facts established by the record. (R. 758 at 2-7.) When viewed in the light most favorable to Plaintiffs, Lear's delivery of its Car2U® products to GM and Ford constitute "sales" and, hence, separate acts of potential infringement. Indeed, under Section 2-106 of the Uniform Commercial Code, "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." U.C.C. § 2-106. Section 2-401 further explains that, "[u]nless otherwise explicitly agreed[,] title passes to the buyer at the time and place at which the seller completes performance with reference to the delivery of the goods." *Id.* at § 2-401. Lear's insistence that the relevant question is "when infringement first began" is therefore unavailing because the evidence reveals that certain of the allegedly infringing "sales" occurred after Defendant's bankruptcy filing. These constitute distinct acts of alleged infringement, each of which gives rise to independent causes of action for patent infringement. *Hazelquist*, 437 F.3d at 1178.

The cases relied upon by Lear do not alter this conclusion. In *Wang Laboratories*, the Federal Circuit embraced the principle that "[t]he key element in setting a reasonable royalty . . . is the necessity for return to the date when the infringement began." *Wang Labs.*, 993 F.2d at 870 (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978)); *accord Fromson*, 853 F.2d at 1575. This tenet of law merely provides superficial support for Lear's position. The Federal Circuit has explained that "[t]he purpose of compensatory damages is . . . to make the patentee whole." *Pall Corp. v. Micron Separations,*

10

*Inc.*, 66 F.3d 1211, 1223 (Fed. Cir. 1995). It has also made clear that "[t]he foundation of a reasonable royalty analysis is a hypothetical negotiation between the patentee and the accused infringer at the time the infringement began." *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1308 (Fed. Cir. 1999).

These two principles complement one another. In order to make the owner of an infringed patent whole, it is of course necessary to calculate a reasonable royalty from the moment infringement began. *See, e.g.*, *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010). To do otherwise would entail predicting the outcome of a hypothetical negotiation in circumstances other than those in which negotiations between a prospective licensor and willing licensee would take place. Such a prediction would inevitably be skewed, and hence inaccurate.

Ultimately, *Wang Laboratories* and *Fromson* speak to the manner in which courts should compute damages with respect to an established instance, or course, of infringement. They do not hold that, in computing damages for independent acts of infringement taking place over a protracted period of time, a court must aggregate damages and treat all of them as accruing as of the date of the earliest instance of infringement.

Defendant also looks to an unreported, nonbinding decision of the Southern District of Texas to the effect that "a plaintiff may not arbitrarily shift the date of accrual to avoid limitations on damages and allow for larger recovery." (R. 656 at 11 (citing *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, No. H-03-2910, 2006 WL 3227315, at *1, *5 (S.D. Tex. Nov. 6, 2006)).) *Transocean* does not support Lear's position. In that case, the defendant's first act of infringement took place before the lawsuit. *Id.* at *3. The patentee

11

argued that that particular instance of infringement "did not accrue or affect damages" because the law would otherwise have barred the relevant up-front payment under 35 U.S.C. § 287(a). *Id.* The court observed the well-settled principle that "hypothetical negotiations are determined to have occurred when the infringement began," and held that the royalty payment accrued when the defendant made its infringing offer. *Id.* at 3-5.

Lear points to *Transocean* as a case in which a plaintiff impermissibly tried "to change the date of accrual of damages in [its] effort to seek a larger recovery." (R. 656 at 11.) The *Transocean* plaintiff's actions, however, are distinct from those of Plaintiffs in the present case. Chamberlain and JCI do not argue that the "offers for sale" underlying the supply agreements do not constitute the first act of infringement. Nor do they submit that those agreements did not give rise to a cause of action in damages. Instead, and quite unlike the plaintiff in *Transocean*, they argue that subsequent and independent acts of infringement (specifically, actual sales of Lear's Car2U® products) created discrete causes of action that give rise to their own damages.

### III. Plaintiffs Are Not Estopped from Arguing that Damages Accrue from the Date of Shipment

Lear's final argument is that Plaintiffs are estopped from arguing that certain of their damages accrued post-petition. (R. 757 at 8-10.) Lear points to Plaintiffs' prior assertion that it "continues to sell its infringing products into the market, causing damage . . . . These damages exceeded $88 million as of the Petition date, and they continue to accrue due to Lear's ongoing infringement." (*Id.* at 8-9.) Defendant observes that "the $88 million in alleged pre-petition damages is almost precisely the $85 million in total damages Chamberlain and JCI are now seeking." (*Id.* at 9.)

Lear raises this argument for the first time in its reply brief, and so it is waived. *See, e.g.*, *Draine v. Bauman*, 708 F. Supp. 2d 693, 710 (N.D. Ill. 2010). Even if the Court were to address the argument on the merits, however, there is no inherent contradiction in Plaintiffs' argument that damages accrued from the supply agreements, but that those damages are distinct from those that follow from the actual sales that subsequently took place.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion for partial summary judgment on the accrual date of Plaintiffs' alleged damages.

**Dated:** December 9, 2010

                              **ENTERED**

                              _____
                              **AMY J. ST. EVE**
                              **United States District Court Judge**