IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

THE CHAMBERLAIN GROUP, INC., a
Connecticut Corporation, and JOHNSON
CONTROLS INTERIORS, LLC, a Michigan
Limited Liability Company,

       Plaintiffs,

       v.

LEAR CORPORATION, a Delaware
Corporation,

       Defendant.

Civil Action No. 1:05-cv-03449

Circuit Judge Richard A. Posner



## PLAINTIFFS' RESPONSES TO LEAR CORPORATION'S MOTIONS IN LIMINE

| No. | Title of Plaintiffs' Responses to Lear Corporation's Motion in Limine |
|-----|------------------------------------------------------------------------|
| 1 | Plaintiffs' Response to Lear's Motion in Limine No. 1 Regarding Pre-Production Versions of Car2U Software |
| 2 | Plaintiffs' Response to Lear's Motion in Limine No. 2 Regarding TwisThink and Dykema |
| 4 | Plaintiffs' Response to Lear's Motion in Limine No. 4 to Preclude Argument Concerning Compatibility with Chamberlain GDOs |
| 5 | Plaintiffs' Response to Lear's Motion in Limine No. 5 to Regarding Allegations of Copying |
| 7 | Plaintiffs' Response to Lear's Motion in Limine No. 7 to Preclude Argument Equating Powers of Two with Binary Numbers |
| 8 | Plaintiffs' Response to Lear's Motion in Limine No. 8 Regarding the Kraft Patent |
| 9 | Plaintiffs' Response to Lear's Motion in Limine No. 9 Regarding Plaintiffs' Exhibits |

| Exhibit No. | MIL Citing Exhibit | Description of Exhibit |
|---|---|---|
| 1 | 1 | Letter from Defendant, dated July 9, 2008 |
| 2 | 1 | Excerpts of Deposition Testimony of Mbiye Mpasu, dated July 23, 2008 |
| 3 | 1 | Excerpts from Deposition Transcript of Jason Bauman, dated May 13, 2009 |
| 4 | 1 | Excerpts from Deposition Transcript of Brian Jones Jurries, dated February 11, 2010 |
| 5 | 1 | Excerpts from Deposition Transcript of Clifford Kraft, dated May 27, 2010 |
| 6 | 2 | Excerpts from Deposition Testimony of Kurt Dykema |
| 7 | 2 | Hearing Transcript Regarding Plaintiffs Motion to Enforce Subpoena of Kurt Dykema, dated February 8, 2010, from *The Chamberlain Group, Inc. and Johnson Controls Interiors, LLC v. Lear Corporation* (W.D. Mich. Case No. 1:09-mc-131) |
| 8 | 2 | Excerpts of Deposition Testimony of Kurt Dykema, dated August 16-17, 2005 and March 25, 2010 |
| 9 | 2 | Excerpts of Deposition Testimony of Kenan Rudnick, dated June 16, 2010 |
| 10 | 5 | LEAR0010840 |
| 11 | 5 | LEAR0010282 – LEAR0010283 |
| 12 | 5 | LEAR0013749 – LEAR0013750 |
| 13 | 5 | Excerpts of Deposition Transcript of Clifford Kraft, dated July 22, 2008 |
| 14 | 8 | Letter from Defendant, dated August 4, 2008 |
| 15 | 9 | Excerpts from Deposition Transcript of Brian Jones Jurries, dated February 11, 2010 |
| 16 | 9 | Excerpts from Deposition Transcript of Jason Bauman, dated May 13, 2009 |
| 17 | 9 | Excerpts from Deposition Transcript of Clifford Kraft, dated May 27, 2010 |
| 18 | 1 | LEAR0000697, LEAR0000703 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC., a Connecticut Corporation, and JOHNSON CONTROLS INTERIORS, LLC, a Michigan Limited Liability Company,<br><br>      Plaintiffs,<br><br>      v.<br><br>LEAR CORPORATION, a Delaware Corporation,<br><br>      Defendant. | Civil Action No. 1:05-cv-03449<br><br>Circuit Judge Richard A. Posner<br><br>**FILED UNDER SEAL - CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER** |

**PLAINTIFFS' RESPONSE TO LEAR'S MOTION IN LIMINE NO. 1 REGARDING
PRE-PRODUCTION VERSIONS OF CAR2U SOFTWARE**
_____

## I.      INTRODUCTION

Lear seeks to exclude nine exhibits related to the development and early offers for sale of

the accused Car2U product, as well as the entire deposition testimony of Jason Bauman and Kurt

Dykema.  Lear argues that this evidence is not relevant because earlier prototypes are not the

commercial product, and because such evidence would cause jury confusion.  In reality, Lear

seeks to have this evidence of early development and offers for sale of Car2U excluded from this

case because Lear's development of the Car2U device demonstrates multiple instances of

infringement along the way and a reckless and willful disregard for the asserted patents.

Plaintiffs, for their part, are mindful of the need to avoid jury confusion, and have focused much of their case on the production version of the Car2U. Indeed, Plaintiffs already agreed to drop pre-production versions of the Lear software code from the trial evidence. Additionally, if one looks at the allocation of trial hours in this case, the majority of Plaintiffs' case will focus on infringement of the production version of Car2U and validity. The evidence Plaintiffs would introduce on what Lear refers to as "pre-production" versions is a concise set of materials focused on Lear's design and earlier infringing activity, and is described more fully below. It will help the jury to understand Lear's intent in developing the infringing technology and goes directly to the issues of willfulness that will be before the jury.

At bottom, Lear's motion is just another attempt to hide its willfulness and tip the case in its favor. Whereas Plaintiffs have been working with this Court in good faith to narrow the case in a fair and balanced way, Lear uses the concept of "narrowing" as a sword and a shield. Just as Lear improperly invoked the attorney client privilege during discovery to hide its willfulness, Lear now latches onto the Court's desire to narrow this case to try to further hide its willfulness (while insisting all along that it should be allowed to use any helpful evidence it produced to show it acted carefully). Lear's actions are akin to a robber trying to hide years of evidence showing how he planned a robbery under the veiled argument that it is better for the jury to only hear about what happened the day the house was robbed, while at the same time introducing self-serving and irrelevant evidence from the prior period.

Lear's arguments about relevance and narrowing have no merit. If the documents did not show what Plaintiffs say they show, Lear would not be moving to exclude them. Lear's Motion in Limine No. 1 should be denied.

## II.     THE SOURCE CODE (PX-129)

Lear's Motion No. 1 presumably seeks to exclude pre-production versions of the Lear Car2U software, i.e. versions prior to production Version 7.  Lear has represented through the course of this litigation that the earlier versions of source code that it produced[1] are the same as the production version in terms of the accused functionality.  Plaintiffs have accordingly dropped from their exhibit list all versions of Lear's source code except for the production version.  Thus, the issue of pre-production source code is ***moot***.

Lear also seeks to exclude Plaintiffs PX-129, which is an electronic copy of the full Lear source code in its native form.  However, this is the ***production*** version.  Lear itself has represented that this is the Car2U source code for the production version of Car2U.  *See* Ex. 1; Ex. 2 at 23:18-24:9.  Plaintiffs have accordingly included this electronic copy of the full production version, as well as a hardcopy of the specific portions of the code that set forth Lear's method, PX-100, as exhibits.  This will ensure that the Jury has the complete source code that operates in the accused Car2U device, as well as the key portions of the source code evidence provided as an easily referenced paper exhibit.  Because PX-129 is the source code for the production version, and Lear has not suggested otherwise, it should not be excluded.

In addition, Plaintiffs move to exclude Lear from using comments that it inserted into its source code as affirmative evidence supporting its case for non-infringement.  Such comments are hearsay and, indeed, may have been written with this litigation in mind.  For this reason, Lear should not be permitted to rely upon them for the truth of the matter asserted.

---

[1] Lear has not produced any source code for early prototypes, despite Plaintiffs' requests that such source code be produced, and has represented that certain such source code is not available.

### III.    THE OTHER EVIDENCE

The second category of evidence that Lear seeks to exclude relates to Lear's pre-production work to design and sell Car2U. Throughout this case Lear has flip-flopped from asserting, as it does in its Motion in Limine No. 2, that such evidence is not related to any issue in this case, to asserting as it surely will at trial, that Lear's early design efforts show that they were careful and not willful. The bottom line is that the evidence concerning Lear's pre-production activities shows Lear's willfulness in developing Car2U, and defeats any claim by Lear that it exercised extreme caution in "designing around" the patents. The evidence is, therefore, directly related to the issues to be tried in this case.

### A.    What Plaintiffs' Evidence Shows

The testimony and documents targeted by this motion show that Lear had full knowledge of the patents-in-suit when it began development of Car2U in 2002, and knew that it needed such a license in order to enter the market. (*See* Plaintiffs' Response to Lear's Motion in Limine No. 2.) The targeted documents and the testimony also establish that, in parallel with these efforts – despite not getting a license to practice the asserted patents and despite not yet having the algorithm that it is currently using – Lear moved forward with its development efforts and even offered its product for sale by inserting the actual Chamberlain algorithm into a placeholder in its code. In short, this evidence, taken as a whole with the other evidence to be presented and as explained below, shows that Lear recognized that it was likely to get sued, but was willing to take that risk, and therefore moved forward with all speed and with careless disregard in order to get Car2U to market. The only thing Lear was careful about was hiding its efforts under the cloak of secrecy and the attorney client privilege.

In particular, Lear seeks to exclude PX-35, ██████████████████

███████████████████████ Mr. Bauman testified that this document was█

██████████████████████████████████████████████████

███████ (Ex. 3 at 206:18-21.) He explained that this document███████████

██████████████████████████████████████████████████

███████████████ (*Id.* at 207-14-18.) The document also reflects

that ███████████████████████████████ and Mr. Bauman

testified that ███████████████████████████████████████

██████████████████████████████████ (PX-35

at LEAR0000829; Ex. 3 at 208:16-209:11.) The document further indicates that███████

██████████████████████████████████████████████████

███████ (PX-35.)

Lear also seeks to exclude PX-105, which is a memo dated February 24, 2005. This

memo was█████████████████████████████████████████████

██████████████████████████████████████████████████

███████ (Ex. 3. at 100:9-12.) Mr. Jurries testified about this very document, and Lear does

not seek to exclude his testimony about what it shows; the jury should see what Mr. Jurries was

talking about. Mr. Jurries authored the document in January to February 2005. (Ex. 4 at 36:18-

23.) He confirmed that the document███████████████████████████████

██████████████████████████████████████████████

█████████████████ (*Id.* at 38:4-14; *see also* 38:13-25; 55:4-57:9.) Thus, this

document shows that Lear knew the Chamberlain code – and knew that it should not use the

Chamberlain code.

Lear further seeks to exclude PX-50 through PX-52, which are  These memos

The January 2004 memo reports that

(PX-50.) The May memo announces that Lear

(PX-50.) The July and September memos detail

(PX-51, PX-52.)

These documents demonstrate that, in 2004, Lear was actively promoting and offering for sale a Universal Garage Door Opener product that was compatible with Chamberlain products at the time that it claimed to have an algorithm compatible with the Chamberlain algorithm but had not developed its purported design-around algorithm, which was developed in early 2005. The evidence in this case shows that the only algorithm Lear had at that time was the actual Chamberlain algorithm that it somehow was able to get its hands on (thus demonstrating Lear's extreme disregard for Chamberlain's rights). Lear's actions are analogous to New Company offering for sale Coke in a New Company can, demonstrating their "product" by letting McDonald's taste the product (Coke), securing a large contract with McDonald's based on the taste of Coke, then at the last minute realizing it needs to deliver product and quickly trying to tweak Coke insubstantially so that McDonald's wouldn't know the difference. Such actions are willful and wrong.

Response to Lear's MIL No. 1 (vi)

Lastly, Lear seeks to exclude PX-54 and PX-55, two documents pertaining to  The first of these is (PX-54.) The latter is (PX-54 at page 2.) Mr. Harwood provides Lear's responses. He states (*Id.* at page 1.) Importantly, Mr. Harwood reports on (*Id.*)

These memos establish that, in June 2004, when Lear had "Chamberlain's algorithm" but *before* it developed any alleged design around algorithm in 2005, Lear had and demonstrated (to at least one potential customer) a Universal Garage Door Opener that opened Chamberlain rolling code garage doors. The only reasonable explanation for such compatibility is that Lear was using and offering for sale the actual proprietary Chamberlain algorithm at that time. Again, this is the New Company/Coke example and is highly relevant to willfulness. This is actual

Response to Lear's MIL No. 1 (vii)

infringement (offering for sale, making, using) that cannot be refuted and that shows Lear's complete disregard for Plaintiffs' patent rights.

**B.    Plaintiffs' Evidence is Relevant**

Taken as a whole, the documents and testimony at issue in this motion show that, as of 2004, Lear (1) had detailed plans to provide a Universal Garage Door Opener that was compatible with Chamberlain's garage door openers, which it understood to be proprietary, and (2) was actively promoting a Universal Garage Door Opener that was demonstrated to be compatible with the Chamberlain rolling code systems – even though other evidence establishes that Lear had not yet developed any algorithm of its own that was capable of opening a Chamberlain system. This evidence is indicative of Lear's willfulness and Plaintiffs should be permitted to show it to the jury.

In short, the evidence shows Lear's desperation to get a share of the market that JCI created. Other evidence indicates that Lear ███████████████████████████ ███████████████████████████ (*See, e.g.,* Ex. 5 at 626:23-627:9; PX-167 at NSHN000006-07) Lear does not seek to exclude the evidence of Mr. Kraft's work. However, Mr. Kraft did not ███████████████████ (*See, e.g.,* Ex. 5 at 558:8-1; 655:14-25; PX-183). Before that time, as shown by the evidence at issue here, Lear began working to sell its Car2U to the auto makers. And, as indicated by the questions in PX-54 ██ ███████████████████████████ This was almost a year before Lear finally received and implemented the algorithm that is used in its commercially available Car2U, and almost two years before it filed the application that issued as the Kraft patent. In an effort to entice Chrysler and substantiate all of its offers to other auto makers, and

as shown by the evidence here, Lear ███████████████████ – a prototype that could only have used the *actual* Chamberlain security algorithm.

Lear argues that this evidence should be excluded because it does not pertain to the commercial version of the accused product, and because Plaintiffs' experts have not offered opinions regarding infringement of the product offered 2004. However, Plaintiffs experts cannot offer technical opinions as to these early pre-production prototypes that were offered for sale in 2004 because Lear has not produced any source code or other detailed technical evidence for these prototypes. The production version of the Lear software ██████████████████ ████████████████████████ (Ex. 18.) The earlier prototype software either conveniently no longer exists, or Lear is hiding the evidence behind its cloak of privilege. In either case, Lear should not be allowed to exclude the evidence at issue here on the grounds that Plaintiffs and their expert have not provided such opinions as to whether or not the early Lear prototype infringed.

Moreover, the evidence offered by Plaintiffs goes to Lear's intent in developing the Car2U that was in fact later sold. This evidence indicates that Lear pressed forward in bringing its Car2U product to market despite its inability to secure a license to Chamberlain's patents and despite its inability to devise an alternative algorithm. The evidence strongly suggests that Lear offered for sale a prototype that used the actual Chamberlain algorithm. To the extent the jury should conclude that the algorithm used was the actual Chamberlain algorithm, this evidence would clearly demonstrate willful infringement.

However, the jury need not conclude that Lear offered a clearly infringing product for sale in order for this evidence to be relevant to willful infringement. Lear's willful disregard for Chamberlain's intellectual property is evident throughout the Car2U development process, as

shown by the evidence at issue here. Lear's behavior in the face of Chrysler's demands, and the lack of evidence to show that it had any alternative algorithm at the time, is probative of Lear's intent to develop its Car2U product *no matter what.* It is thus relevant.

Moreover, to the extent that Lear may argue that the product it offered for sale in 2004 contained its currently used algorithm, then the Kraft patent (which Lear now argues covers its product) is invalid due to an on-sale bar. This is because Lear did not file the application that issued as the Kraft patent until April 2006 – *almost two years after it demonstrated its working prototype* ▮▮▮▮▮ Lear cannot have it both ways: either it offered a prototype that had the actual Chamberlain algorithm, in which case it willfully infringed, or the patent that it seeks to use to support its claims of non-infringement is invalid. The jury should hear the evidence and decide.

### C.    Plaintiffs' Evidence Will not Cause Confusion

As to the danger of jury confusion, the limited set of documents and testimony identified by Lear for preclusion will not be misleading or hard for the jury to decipher. This evidence is relevant to and will help the jury understand how Lear designed and developed the Car2U device. This distinction can be easily explained to the jury. The documents are not source code; they can be read and understood by the jurors, and are just the type of documents that jurors can judge – documents created and sent in the course of working on a project.

Moreover, the two non-precedential cases Lear cites in support of its assertion that the jury will be confused by such evidence are both easily distinguished. For example, *Respironics, Inc. v. Invacare Corp.* deals with the issuance of a permanent injunction following a jury trial where the plaintiff never even alleged that the current version of the accused device infringed the patent at issue. 2008 WL 111983 at *1 (W.D. Pa. 2008). Instead, the court was merely deciding

Response to Lear's MIL No. 1 (x)

whether to issue a permanent injunction covering the current iteration of the product based on the jury's finding that the previous version had infringed. *Id*. at *2-5. There is no mention whatsoever of jury confusion or misunderstanding.

Likewise, *Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.* contains no mention of jury confusion or misunderstanding. 706 F.Supp. 1146 (D. Del. 1989). In that case, the court was considering a defendant's motion for summary judgment of non-infringement where the plaintiff had dropped assertions of literal infringement against an accused product and decided to rely only on the doctrine of equivalents. *Id*. at 1149-50. In dicta, the court simply conjectured that the plaintiff's abandoned literal infringement position was based on a non-accused pre-production version of the device. *Id*. at 1150. The court did not hold that documents or testimony related to how or why the device was changed in its commercial implementation would be confusing to jurors or irrelevant to the issues of infringement or willfulness. *Id*.

What would be confusing is the jury instruction that Lear has requested in the alternative. —an instruction (and a corresponding addition to the verdict form) that the only accused product in this case is the production version of the Car2U device. The only result of Lear's proposed language would be to mislead the jury into thinking that evidence relating to development of the Car2U device should be distinguished from evidence relating to the final production version. Such confusion would distract from the jury's ability to impartially gauge whether or not Lear acted willfully in bringing to market the accused Car2U device, and would add yet another factor that the jury must consider in reaching their verdict. Such an instruction is potentially confusing and unnecessarily complicating, and should not be implemented.

Response to Lear's MIL No. 1 (xi)

**IV.     CONCLUSION**

For the foregoing reasons, Lear's Motion in Limine No. 1, and its request for a proposed jury instruction and addition to the verdict form, should be denied.  In addition, the Court should preclude Lear from using comments in its source code as affirmative evidence supporting its case for non-infringement.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

THE CHAMBERLAIN GROUP, INC., a
Connecticut Corporation, and JOHNSON
CONTROLS INTERIORS, LLC, a Michigan
Limited Liability Company,

      Plaintiffs,

      v.

LEAR CORPORATION, a Delaware
Corporation,

      Defendant.

Civil Action No. 1:05-cv-03449

Circuit Judge Richard A. Posner

**FILED UNDER SEAL - CONTAINS
HIGHLY CONFIDENTIAL
INFORMATION SUBJECT TO
PROTECTIVE ORDER**

## PLAINTIFFS' RESPONSE TO LEAR'S MOTION IN LIMINE NO. 2 REGARDING TWISTHINK AND DYKEMA

## I.  INTRODUCTION

Putting Lear's motion in context, Lear entered into its design of Car2U with full knowledge of Chamberlain's patent rights. Lear started its design process knowing the Chamberlain patents were strong and having every intention of either: (i) entering into an agreement with Chamberlain to license the patents or (ii) proceeding with a product whether or not it could avoid the patents. In fact, before Lear even knew whether or not it could design around the patents, it offered for sale (an infringing act) and demonstrated (the infringing act of using) Car2U to Chrysler with the actual *Chamberlain* code! It also ███████████ ████████████████████████████████) What Lear offered for sale could

Response to Lear's MIL No. 2 (i)

not have been the "Kraft algorithm" or its current algorithm because those algorithms did not yet even exist!

Lear knew its actions were wrongful and tried to hide them. Lear spent years shrouded under the cloak of attorney client privilege, working in clean rooms, walling off certain people from certain efforts and even using code words and letters and preventing the use of email so that its willful design efforts would never be discovered. Lear was not only concerned about its early design efforts but also with its final algorithm, which it threw together quickly when it realized it was running up against the timeline to deliver ███████████

Now Lear would like to selectively use some of its design efforts to "prove" how careful it was, while hiding any design efforts that show wrongdoing. The only thing Lear was careful about was hiding its wrongdoing. It should not be able to gain from that secrecy by now using the attorney client privilege as both a sword and a shield, and by hand picking for both parties only evidence that benefits Lear.

Lear's attempt to keep from the jury the very small amount of Dykema testimony and TwistThink documents Plaintiffs carefully selected is unreasonable. Plaintiffs proposed narrowing the testimony, and have accordingly selected a minimum of testimony needed to show willfulness and to rebut Lear's related arguments to the contrary. Though Lear staunchly refused to produce any discovery other than the Dykema deposition and Dykema documents it was ordered to produce, the Dykema testimony is clear enough to show foul play. JCI had to file a motion in the W.D. Michigan to enforce a subpoena served on Mr. Dykema after Lear objected and insisted that responsive documents be identified by using key word searches. At the hearing in the matter, after learning about Lear's use of code words during developments and how search

terms would be ineffective as a result of that, the Court ordered production of all responsive documents.  (Ex. 7 at 4-9, 15-17, 23-24, 46-48.)

Lear seeks to exclude seven exhibits relating to Lear's relationship with TwisThink early in the development of its Car2U product and Plaintiffs' designated deposition testimony of Kurt Dykema.  Lear's says that this evidence is not relevant because "Lear did not use the TwisThink design[,] which did not include the Chamberlain rolling code algorithm and was incapable of opening Chamberlain rolling-code garage-door openers," and because Mr. Dykema and his firm TwisThink were "walled off from working on the Chamberlain rolling code project."  However, Plaintiffs do not offer Mr. Dykema's testimony or the seven exhibits for the purpose of establishing TwisThink's design or their work on the Chamberlain rolling code project.

The designated testimony of Mr. Dykema, which will take only 16 minutes to hear (the transcript is attached as Exhibit 6), together with the seven short documents, will establish: (1) Lear's understanding that it would need a license to Chamberlain patents to implement the Chamberlain rolling code algorithm; (2) Lear's pattern and practice with respect to the development of a product that would be compatible with the Chamberlain algorithm, including its policy of secrecy and deception; and (3) the fact that Lear learned, implemented and marketed the actual Chamberlain algorithm in 2004.  Some of this testimony can only come in through Mr. Dykema because Lear itself was unwilling to admit what it had done.

Because these three factors are all highly relevant to the issue of Lear's willfulness if the Lear Car2U product is found to be infringing, and because Plaintiffs' designations of testimony and identification of exhibits are tailored to provide only a minimum of background information and the key testimony of Mr. Dykema on these issues, Plaintiffs respectfully request that the Court deny Lear's Motion in Limine No. 2.

Response to Lear's MIL No. 2 (iii)

## II.     THE EVIDENCE AT ISSUE

### A.     Mr. Dykema's Testimony and Associated Exhibits

Plaintiffs' narrowed designations of the testimony of Mr. Dykema are concise and limited in nature. (*See* Ex. 6; original transcripts included as Ex. 8.) They provide background information sufficient to give the jurors a foundational sense for Mr. Dykema and his experience with Universal Garage Door Openers, as well as the relationship that he and his company, TwisThink, had with Lear during the period of about 2001-2004.

Importantly, Mr. Dykema's testimony and exhibit PX-53 (and PX83, which is a duplicate of PX-53 and is hereby withdrawn) indicate ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Mr. Dykema testified as follows:

████████████████████████████████ ████████████████████████████ ██████████████████████████ ████████████████████████████████ ████████████████████

(Ex. 6, 8 at 170:13-21.) In addition, ████████████████████████████ ████████████████████████████

████████████████████████████████ ████████████████████████████ ████████████████████████████

(PX-53; PX-83.)

Mr. Dykema's testimony also indicates that ███████████████████

████████████████████████████████████████████

████████████████████████████



(Ex. 6, 8 at 23:20-24:11.)

Importantly, PX-38 indicates that ██████████████████████

████████████████████████████████████ In that email,

Mr. Dykema explains, ███████████████████████████████

███████████████████████ (PX-38.) Mr. Dykema's designated testimony

indicates ███████████████████████████████████████

██████████████

Response to Lear's MIL No. 2 (v)



(*Id.* at 85:1-11.)  Because the use of code words may seem unusual to a jury, Plaintiffs have designated the following minimal testimony to explain this:



(Ex. 6, 8 at 312:18-22.)

Mr. Dykema's testimony further indicates that

(*Id.* at 117:5-20.)

Plaintiffs have designated additional testimony and have identified two documents regarding further work by TwisThink and Lear to develop a working prototype installed in a Chrysler Pacifica vehicle.  (Ex. 6, 8 at 107:6-20 and PX-36; Ex. 6, 8 at 141:10-142:20 and PX-

40.) The documents set the time at July 2003 to February 2004. Here again, Mr. Dykema testifies that ███████████████████████ He further notes that, ██████████ ██████████████████████████████████ (Ex._ 6, 8 at 142:6-8.) Lear was demonstrating to potential customers the Car2U with Chamberlain code and ended up delivering the product with Lear's version of that code. This demonstrates not only Lear's disregard for Plaintiffs' patent rights but also the interchangeability of the relevant portions of the code.

### B. Two Other Documents

By its Motion in Limine No. 2, Lear also seeks to exclude two additional documents that that were presented at the deposition of Mr. Ken Rudnick, the person at Lear who instituted and lead the development of Car2U. The first of these documents, PX-84, █████████ ██████████████████████████████████████████ ███████████████████████████ This article is relevant to show the commercial success of HomeLink and is thus relevant to the non-obviousness of the patents. Indeed, Plaintiffs' expert has relied upon it for this purpose. The second of these documents, PX-87, is ████████████████████████████████████ ███████████████████████ Mr. Rudnick testified that this was █████████ ██████████████████████ (Ex. 9 at 183:23-184:24.) This document will help the jury to understand the relationship between TwisThink and Lear.

## III. ARGUMENT

### A. The Evidence is Highly Relevant to Willfulness

There is no dispute that Lear hired Mr. Dykema and TwisThink to work on the development of a garage door transmitter product to compete with JCI's HomeLink. There

should also be no dispute that Lear provided some information about its development efforts to

TwisThink. Indeed, the testimony that Lear cites indicates as much: Mr. Dykema was asked

███████████████████████████████████████████████████████

██████ This presupposes the more pertinent fact, established by the testimony that Plaintiffs have

designated, which is ████████████████████████████████████

This evidence goes directly to Plaintiffs' willfulness case, which is based at least in part

upon the fact that Lear proceeded to obtain the Chamberlain algorithm and develop its Car2U

device even after it was denied a license from Chamberlain. Mr. Dykema's testimony shows that

███████████████████████████████████████████████████████

████████████████████████ This evidence shows that Lear implemented the actual

Chamberlain algorithm as some point prior to 2005. If Lear has evidence to the contrary or to

suggest it demonstrated the product with some other code, it has yet to come clean with that

evidence.

Mr. Dykema also testified that ████████████████████████████

██████████████████████████████ This was at a time when Lear had the

actual Chamberlain algorithm but did not have an alternative implementation of it. Thus, this

evidence supports willfulness because it shows that Lear was at least using the actual

Chamberlain algorithm. Mr. Dykema's testimony corroborates other evidence indicating that

Lear had a device that operated Chamberlain rolling code garage doors as of June 2004. (*See*

Plaintiffs' Response to Lear's Motion in Limine No. 1.)

## B. The Evidence is Not Prejudicial

Lear alleges that Plaintiffs "contend that by using code words such as "Legacy" and

"secret sauce" to describe respectively the development of a competing garage-door opener, Lear

somehow acted improperly" and tries to explain that "[c]ommercial projects are routinely given code names, and there is nothing sinister about their use." Mr. Dykema does testify about the use of code words by both TwisThink and Lear to discuss their work to develop a Universal Garage Door Opener product. However, this information is needed to understand the supporting documents – Mr. Dykema understood, for example, that ███████████████████ ██████████████ More generally, Lear's practice in this regard is highly relevant to the issue of willfulness, because the use of code words such as "Project Legacy" and "secret sauce" indicate a desire and intent to keep information secret. Lear argues that there are good reasons to keep legitimate development work secret, and that may be so. But the use of code words as a general matter does not demonstrate that the code words used by Lear and TwisThink were used purely as a matter of practice in the industry. Lear is free to provide testimony regarding such practices and to cross examine Mr. Dykema if he appears live at trial. But this is not a basis to exclude testimony on such matters.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Lear's Motion in Limine to exclude the testimony of Mr. Dykema and exhibits PTX 36, 38, 40, 53, 83, 84, and 87.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC., a Connecticut Corporation, and JOHNSON CONTROLS INTERIORS, LLC, a Michigan Limited Liability Company, Plaintiffs, v. LEAR CORPORATION, a Delaware Corporation, Defendant. | Civil Action No. 1:05-cv-03449 Circuit Judge Richard A. Posner |

**PLAINTIFFS' RESPONSE TO
LEAR'S MOTION IN LIMINE NO. 4 TO PRECLUDE ARGUMENT
CONCERNING COMPATIBILITY WITH CHAMBERLAIN GDOs**

## I.    INTRODUCTION

Lear's motion is part of its continued effort to remove context from this case and comes on the heels of Lear refusing to agree to a joint tutorial that would provide appropriate and helpful context for the jury.  For example, the joint tutorial provides little context because Lear refused to agree to materials this Court has already seen and approved, including materials relating to bullets 2 and 3 in the Court's March 16, 2011 Order (D.I. 971), as well as slides showing how the garage door opens in response to the click of the transmitter and how without security someone could grab that code.  Lear refused to agree to this helpful and balanced material unless it could add advocacy into the slides supporting its erroneous obviousness

argument that an invention is obvious if all the individual elements of the invention existed some place in the prior art.

At every turn, consistent with what has become Lear's *modus operandi*, Lear tries to use this Court's direction as rhetoric that can be used as both a sword and a shield. Lear fought hard to narrow Chamberlain's patent claims in this case by relying on this Court's directive to narrow. Only after simplification of Plaintiffs' case did Lear push to complicate the case by adding its own patent (the Kraft patent) in this case and now 22 pieces of prior art, many of which the Patent Office already evaluated. (D.I. 968, Lear Invalidity Contentions.) Lear used this Court's simplification guidance to ensure that Plaintiffs would have only one technical expert. Now, after Plaintiffs agreed, Lear has the audacity to push to convert Plaintiffs' own prosecuting attorney Ken Samples, whose opinions are not relevant in a case like this, into a second technical expert for Lear. (D. I. 957, Plaintiffs' Motion in Limine 17.)

What Plaintiffs are seeking is simple. Plaintiffs seek ***jury understanding*** and a ***level playing field <u>not tainted by Lear's strategy in this case</u>***. All of Plaintiffs' motions and responses support this goal.

Lear in its Motions in Limine 1 (Design Work Generally), 2 (Dykema's Design Work), 4 (Operation with Chamberlain Garage Door), 5 (Lear's Reverse Engineering), 7 (Binary and The Powers of Two), and 9 (Plaintiffs' Relevant Support and Exhibits) seek to selectively exclude context and relevant facts and tilt the playing field in Lear's favor by gutting part of Plaintiffs' case. Lear's Motion in Limine 8 (Kraft) seeks to introduce evidence on which Lear's own witnesses refused to testify; which Lear's own witnesses admitted was irrelevant; and over which Lear itself claimed a privilege (using privilege as a shield then and a sword now). Lear has gamed this litigation from day one and should not be allowed to continue to use deceptive

strategy and this Court's direction as mere rhetoric, to elicit a jury verdict that is not a reasoned verdict based on all the relevant evidence the parties were able to fairly explore in this case.

As for this motion, the infringing algorithm has one purpose: to open Chamberlain garage doors. Lear willfully reverse-engineered the Johnson Controls transmitter, copied the Chamberlain algorithm, reproduced Chamberlain's signals, and taught its transmitter to train on Chamberlain garage doors for one purpose: to come up with a transmitter that would open Chamberlain garage doors. Lear aggressively advertises its compatibility. Lear willfully infringed because, before it had the code that is now in Car2U, it demonstrated an infringing version of Car2U with the Chamberlain code███████████████████████████ ███████████████████████████ It then had little time before it had to go into production to put something in its box that would make it compatible.

That Car2U must be compatible is not a side point. It is *the* point. The invention as used *by Lear* relates to a way of encrypting a signal so that when the Chamberlain garage door receiver decrypts that signal it will recognize the signal. Lear's device doesn't just happen to work with Chamberlain; Lear willfully infringed so that it would operate with Chamberlain. If Lear wanted to learn from the disclosure of the patent and develop its own encryption algorithm that either did or did not infringe, it could have done that. It could have developed many different kinds of encryption algorithms for transmitters or receivers. It had many options. But, that is not what Lear did. If Lear weren't compatible, it would not be taking Johnson Controls' business. Additionally, because Lear is compatible, it is able to sell into the garage door space and be commercially successful. Compatibility relates to the nexus that makes Lear's device (which practices the patent) commercially successful (a secondary indicia of nonobviousness).

To remove all mention that Car2U is, as relevant to this invention, a transmitter designed to operate Chamberlain garage doors, would be to gut much of Plaintiffs' case and to have the jury asking "what" or "why" at every turn.

## II.    BACKGROUND AND RELEVANT FACTS

In order to understand this action, the jury requires a straightforward recitation of the underlying technology and issues in the case. At bottom, this case is about the use of encoded signaling, *i.e.*, rolling code signaling for opening and closing garage doors. In this case, Chamberlain designed and developed its own rolling code algorithm for opening and closing its garage door openers, and patented the technology. Here, Lear has designed and developed what it argues is a non-infringing algorithm that serves to actuate or operate, *i.e.*, is compatible with, Chamberlain rolling code garage door openers. Lear argues that its algorithm, including the binary mirroring step, is "all trinary" and therefore does not generate base 2 numbers. However, in order to operate a Chamberlain garage door opener it must send a signal that is received and decrypted by the Chamberlain algorithm in the receiver. The decryption process includes binary mirroring in base 2. If the binary mirroring in base 2 recovers the original number, then the garage door opener will operate, which is an indication that the algorithm in the Car2U transmitter contains the same binary mirroring as in the Chamberlain algorithm. At its heart, this case is whether Lear's way of achieving "compatibility" constitutes infringement, and it would be difficult (if not impossible) to communicate information about the case to the jury without addressing this compatibility.

Indeed, in its summary judgment ruling, this Court provided the following high-level description of the subject matter of this action:

The allegedly infringing product is a universal transmitter used to open garage doors. (R. 434 at 26-27.) In opening those doors, the product's transmitter acts as a remote-control device that encrypts a coded signal each time the transmitter is actuated by the user and communicates that signal on a radio frequency carrier to the receiver, which is usually attached to a mechanical device that operates the garage door. *Id.* The receiver recognizes the coded signal sent from the transmitter, and then causes the mechanical device to operate the garage door. *Id.* The accused device is interoperable with Plaintiffs' garage-opening product, which incorporates the allegedly infringed patented technology. (R. 410-6 at 12; R. 455 at 14.)

(D.I. 810, pp. 3-4.) Accordingly, in generally explaining the nature of the case, this Court addressed the compatibility, or interoperability, of Lear's accused Car2U product and Chamberlain's rolling code garage door openers.

Further, in its motion, Lear (again) mischaracterizes the summary judgment ruling and self-servingly omits pertinent portions, suggesting that the Court determined that "compatibility" was not relevant. In the ruling, this Court found that the fact of compatibility, or interoperability, of the Car2U transmitter with Chamberlain garage door openers was not dispositive of infringement, and ultimately infringement must be determined with reference to the patent claims. *(Id.,* p. 12.) This Court, however, stated that relevance was a different issue:

Put differently, the fact of interoperability does not require mathematical identity in all material respects, such that an accused device necessarily infringes a patented product or process that achieves precisely the same result. Instead, the fact of infringement must be determined by reference to the claims in the patent. [Citation omitted.] ***This is not to say, of course, that interchangeability is irrelevant to infringement analysis – it may be quite pertinent in assessing validity [sic.] under the doctrine of equivalents.*** *See e.g., Fiskars, Inc. v. Hunt Mfg. Co.,* 221 F.3d 1318, 1324 (Fed. Cir. 2000) ***(observing that "[i]nterchangeability is indeed relevant to equivalency")***. Nevertheless, the Federal Circuit has made clear that "interchangeability … is certainly not dispositive." [Citation omitted.]

*Id.* (emphasis added).

That said, Plaintiffs will not argue that the jury can ignore the facts and claims and determine infringement based on compatibility alone.

## III. ARGUMENT

### A. Compatibility is Relevant to Infringement and Invalidity

Irrelevant evidence is inadmissible. Fed. R. Evid. 402. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Contrary to Lear's argument, compatibility is relevant to the asserted patent claims. (D.I. 950, p. 2.) For example, the last element of claim 1 of the '544 patent requires production of a trinary signal "for operation or control of a secure actuator," such as for operation and control of a secure actuator for opening and closing garage doors. Claim 1 therefore requires compatibility between a transmitter that sends an encrypted signal and a secure actuator. Thus, Lear's ability to work with Chamberlain's rolling code garage door openers is directly pertinent to this interoperable claim language.

Further, in the summary judgment ruling, the Court itself recognized the relevance of "compatibility" and interchangeability under the doctrine of equivalents. Indeed, it is well-settled that known interchangeability of technology is relevant to infringement under the doctrine of equivalents. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co*., 520 U.S. 17, 37 (1997) ("known interchangeability … is one of the express objective factors … bearing upon whether the accused device is substantially the same as the patented invention"); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950) ("An important factor [in determining equivalency] is whether persons reasonably skilled in the art would have known of the

interchangeability …"); *In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d 1527, 1542 (Fed. Cir. 1992) (affirming jury verdict of infringement based on evidence of compatibility and functional equivalence of accused modem with the plaintiff's modem).

Here, Plaintiffs will present evidence of literal infringement and infringement under the doctrine of equivalents. Contrary to Lear's argument, Plaintiffs do not intend to argue that the jury must ***presume*** infringement based solely on compatibility and ignore the patent claims. (D.I. 950, pp. 1-3.) Rather, in presenting infringement evidence, Plaintiffs plan to submit evidence that the portion of the Lear algorithm that is at a minimum equivalent to the patented element is interchangeable with that element. The jury can then compare the features of the accused product to the elements of the patent claims and, for infringement under the doctrine of equivalents, determine whether any differences are substantial or whether persons reasonably skilled in the art would have considered interchangeability. The jury cannot conduct a meaningful evaluation without understanding the functionality of the underlying technologies.

Compatibility is also relevant to commercial success, a secondary consideration supporting non-obviousness of the patent claims. "Relevant secondary considerations include: commercial success, long-felt but unsolved needs, failure of others, and the presence of a motivation to combine, or avoid combining, prior art teachings." *Power-One, Inc. v. Artesyn Techs, Inc.*, 599 F.3d 1343, 1351 (Fed. Cir. 2010). The compatibility of the Johnson Controls and Lear transmitters with Chamberlain's rolling code garage door openers, *i.e.*, with the Chamberlain patented technology, is a significant reason for the commercial success of these transmitters. It is the connection with the patented technology that makes the transmitters commercially successful, thereby supporting a conclusion that the asserted patent claims are not obvious and are therefore valid.

Next, Lear argues that the irrelevance of compatibility is somehow shown by the operation of Chamberlain garage door openers with third party (Skylink) transmitters. (D.I. 950, pp. 3-4.) Lear's argument is without merit. Skylink's technology is not at issue here: it is neither the patented technology nor the accused technology. The Skylink transmitter and its operation of Chamberlain garage door openers does not have any bearing on infringement by the **Lear** transmitter or invalidity of the patents-in-suit (which was not even at issue in the Chamberlain and Skylink litigation). Again, Lear is trying to introduce other products or patents into this case to complicate and confuse the issues. Plaintiffs have filed their Motion in Limine 18 to exclude Skylink evidence and respectfully request that this Court grant it. (*See* D.I. 957, Plaintiffs' Motion in Limine No. 18.) In contrast, the compatibility of the accused product (the Lear transmitter) with the Chamberlain rolling code technology is certainly relevant to infringement by the accused product**.**

Though Plaintiffs believe the Court need not reach the issue, Plaintiffs note that Skylink is additionally not relevant because Skylink's product used a ***completely different algorithm*** that did not even include rolling code. Skylink was not operating Chamberlain garage doors using the patented algorithm or anything close. There was no compatibility as related to the patented technology in the Chamberlain garage door opener. That is why the patent infringement count against Skylink was dropped in the Skylink litigation before Skylink even answered the complaint. Instead ,aside from the patented algorithm, Chamberlain's products used to include a "back door" technique unrelated to the patents which permitted resynchronization of a remote to the Chamberlain garage door. Skylink learned of the back door access protocol and took advantage of it to open Chamberlain's garage door operator. Chamberlain removed the back door feature from its products which rendered the Skylink transmitter useless.

Lear's attempt to bar evidence of the compatibility of the accused Car2U transmitter by pointing to the Skylink product is a red-herring, and is no basis to exclude such evidence.

**B.      Plaintiffs' Argument and Evidence Regarding Compatibility are not Unfairly Prejudicial to Lear**

Lear would not be unfairly prejudiced by argument and evidence regarding the Car2U transmitter's compatibility with Chamberlain garage door openers.  (D.I. 950, pp. 1-3.)  To show infringement, both literally and under the doctrine of equivalents, Plaintiffs must necessarily address the compatibility of the Car2U transmitter with the patented Chamberlain rolling code technology, *i.e.*, its ability to operate Chamberlain rolling code garage door openers.   In response, Lear has the opportunity to argue that it designed around the patents and does not infringe.  Further, the jury will be properly instructed regarding the legal requirements for a finding of infringement.

In fact, Plaintiffs would be unfairly prejudiced if not permitted to freely present argument and evidence regarding "compatibility."   As addressed above, courts have recognized the relevance of such argument and evidence to the doctrine of equivalents, and this argument and evidence is also relevant to commercial success and non-obviousness.  In addition, it would be much more difficult to explain the operation of the Car2U transmitter if Plaintiffs are limited in presenting evidence and argument regarding how the Lear transmitter works with Chamberlain garage door openers.  Further, it would also make it more confusing for the jury and would mislead the jury if Plaintiffs cannot present a straightforward explanation of the underlying technologies and issues.

If Lear's motion was granted, then only confusing statements to the jury can be made throughout the entire trial, the exact opposite purpose of motions *in limine*.  The parties would

have to walk on eggshells to keep the only use for Lear's accused code from the jury.  The parties would have to work around documents and testimony all of which, including key technical documents, are littered with references to Lear's device being compatible with Chamberlain technology. Plaintiffs would have to tiptoe around any higher level documents since Lear touts compatibility with Chamberlain aggressively to sell its transmitter.  Plaintiffs would find it impossible to make its willfulness argument because the entire willfulness case is based on Lear's efforts to analyze Johnson Controls and Chamberlain products and patents in order to make a compatible product.

Additionally, if Lear's motion is granted, a scenario such as the following will be forced to transpire: Plaintiffs will describe that the encryption code is developed by Chamberlain to operate Chamberlain garage door openers (transmitters and receivers).  They will describe that the Chamberlain transmitters and receivers use the same algorithm so that the receiver can decode what the transmitter transmits.  Plaintiffs will then describe Lear's code and that it opens garage doors (without mentioning Chamberlain).  This would be extremely misleading to the jury since Chamberlain's code and Lear's code at issue in this case **only operate Chamberlain garage door openers and do not open other types of garage door openers that are manufactured by other companies with which both Johnson Controls and Lear have compatibility agreements.**  Further, granting Lear's motion would create the very issue that concerned this Court about willfulness: the jury needs context and needs to know why their decisions matter. Without knowing that Lear is making a product to open Chamberlain garage doors, the jury will wonder, "why are we even here and why does Johnson Controls care what Lear does?"

Response to Lear's MIL No. 4 (x)

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Lear's Motion in Limine No. 4 to Preclude Argument Concerning Compatibility with Chamberlain Garage Door Openers.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

THE CHAMBERLAIN GROUP, INC., a
Connecticut Corporation, and JOHNSON
CONTROLS INTERIORS, LLC, a Michigan
Limited Liability Company,

      Plaintiffs,

      v.

LEAR CORPORATION, a Delaware
Corporation,

      Defendant.

Civil Action No. 1:05-cv-03449

Circuit Judge Richard A. Posner

**PLAINTIFFS' RESPONSE TO LEAR'S MOTION IN LIMINE NO.
5 REGARDING ALLEGATIONS OF COPYING**

_____

## I.    INTRODUCTION

Lear does not dispute that "copying is relevant in rebutting a claim of obviousness."

Motion at 1; *see also Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317 (Fed. Cir.

2004) ("copying by a competitor may be a relevant consideration in the secondary factor

analysis."). Lear does not even dispute that it reverse engineered a Johnson Controls' HomeLink

device to examine and duplicate its functionality, including the patented Chamberlain security

code. Nevertheless, Lear asks the Court to exclude all mention of copying because (1)

allegations of copying are improper since Lear asserts that the Car2U product does not

"replicate" the HomeLink device; and (2) allowing the jury to consider the issue of copying at

trial would be a waste of time because Lear would need to present evidence to rebut the documents and testimony that establish that it copied the patented Chamberlain algorithm. As to the first point, there is substantial evidence from Lear's documents and testimony that it sought to replicate the functionality of the HomeLink device. As to the second point, allowing the sides to present this competing evidence on secondary considerations of nonobviousness such as copying is precisely what should occur at trial.

Beyond the relevance to obviousness, Lear's copying is also highly relevant to willfulness – a point which Lear's motion ignores. *See, e.g., DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1336 (Fed Cir. 2009) ("[E]vidence of copying in a case of direct infringement is relevant ... to Seagate's second prong, as it may show what the accused infringer knew or should have known about the likelihood of its infringement."). For these reasons, Plaintiffs respectfully request that Lear's motion *in limine* No. 5 be denied.

## II.    BACKGROUND AND RELEVANT FACTS

Plaintiff's technical experts Dr. Stevenson and Dr. Rhyne opined in their reports that there is ample evidence the Lear reverse engineered a Johnson Control's HomeLink device and replicated its functionality, including the patented Chamberlain algorithm. (D.I. 818, Ex. 5 at ¶ 110; D.I. 821-1, Ex. 1 at ¶¶ 53-54.) Lear attempted to exclude these opinions via Daubert motions, which were denied by this Court. (D.I. 884 at 1.) Having lost that fight, Lear now asks the court to simply exclude copying as a secondary consideration of nonobviousness.

## III.    ARGUMENT

Making a factual determination as to the scope and extent of Lear's copying and how it affects the obviousness of the asserted patents is precisely what the jury must do as part of its analysis of the secondary considerations of nonobviousness. *Rothman v. Target Corp.* 556 F.3d,

1310, 1321-22 (Fed Cir. 2009) (secondary indicia of nonobviousness such as copying are "uniquely within the province of the jury"). Plaintiff's experts Dr. Stevenson and Dr. Rhyne have both opined that there was copying. The jury should be permitted to hear this evidence.

For example, Dr. Stevenson noted that ███████████████  ██████████████████████████ (D.I. 818, Ex. 5 at ¶ 110.) He also noted that ████████████████ ████████████████████ *Id.* Finally, he stated that he ███████████ ████████████████ (*Id.*) Among the documents that Dr. Stevenson reviewed are Lear documents showing that Lear had a working prototype – one that opened Chamberlain garage doors – after Mr. Clifford Kraft figured out how the algorithm in the transmitter worked in late 2003 but before Lear developed its alleged "workaround" in early 2005 (LEAR10840 – PX-49). He also testified that he reviewed multiple documents showing ███████████████ (LEAR10282 and 13749 – PX-54 and PX-55). (Ex. 10, 11 and 12.) Even if Lear could argue that its production versions is not a copy, its earlier copying is more than ample evidence to support a secondary indicia of obviousness. As Plaintiffs have expressed in response to Lear's other motions in Limine, this early copying is also highly relevant to willfulness.

Dr. Rhyne also presented a detailed analysis of copying. For example, he pointed out that a Lear software developer, Mr. Jurries, testified that ██████████████ ████████████████ (D.I. 821-1, Ex. 1 at ¶ 54.) Likewise, Dr. Rhyne opined that Lear retained Mr. Kraft, another software developer, to reverse-engineer JCI's transmitter. (*Id.*) Dr. Rhyne also noted that Mr. Kraft testified ████████████



(Ex. 13 at p. 44.) Mr. Kraft also testified that Lear's representatives █████████████████████ ██████████████████████████████████████ (*Id.* at p. 51.) Mr. Kraft likewise ██████████████████ ██████████████████████████ (*Id.*) Dr. Rhyne also opined that Lear's numerous code revisions were in part due to its efforts to emulate the Chamberlain algorithm. (D.I. 821-1, Ex. 1 at ¶ 54.)

Contrary to this evidence, Lear argues that the Car2U device does not replicate the HomeLink product because it uses an "all trinary" implementation and a different computer language (C versus assembly). Regardless of Lear's post hoc characterizations of how the Car2U operates or the language of its source code, whether or not there was copying depends on Lear's development process and the ultimate functionality of the Car2U device. It is undisputed that Lear disassembled and analyzed a HomeLink device in order replicate its ability to open Chamberlain garage doors using the patented security algorithm. At a minimum, there are issues of fact as to whether such activities constitute copying. These issues should be put to the jury. Additionally, and importantly, all of this evidence of copying is also highly relevant to willfulness even if Lear programmed its infringing code in a different computer language.

The case law Lear cites is unavailing. For example, in *Wyers v. MasterLock Co.*, the Federal Circuit held that evidence of copying includes (1) disassembling a patented product, (2) photographing its features; or (3) access to a patented device combined with a substantial similarity between the accused and patented products. 616 F.3d 1231, 1246 (Fed. Cir. 2010).

Response to Lear's MIL No. 5 (iv)

This is precisely the type of evidence that Dr. Stevenson and Dr. Rhyne relied upon in reaching their conclusions regarding copying. Substantial similarity does not require that the accused functionality be exact; it also does not require that unaccused aspects of the device, such as the language the code is written in, be the same. Lear's citation to *Furminator, Inc. v. Ontel Prods. Corp.*, on the other hand, is simply inapposite. 429 F. Supp. 2d 1153, 1174 (E.D. Mo. 2006). In that case, the court was considering whether evidence of copying tended to show infringement. *Id*. Here, Lear's copying activities are not being used to establish infringement, but to support the nonobviousness of the Chamberlain patents.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Lear's motion *in limine* No. 5 be denied.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC., a Connecticut Corporation, and JOHNSON CONTROLS INTERIORS, LLC, a Michigan Limited Liability Company, | |
| Plaintiffs, | Civil Action No. 1:05-cv-03449 |
| v. | |
| LEAR CORPORATION, a Delaware Corporation, | Circuit Judge Richard A. Posner |
| Defendant. | |

**PLAINTIFFS' RESPONSE TO LEAR'S MOTION IN LIMINE NO.
7 TO PRECLUDE ARGUMENT EQUATING POWERS OF TWO
WITH BINARY NUMBERS**

_____

Lear argues that Plaintiffs should not be permitted to submit that "the presence of 'powers of two' in a number in Lear's software means that the number is a binary number." Lear's argument at best miscomprehends Plaintiffs' position, the evidence, and the technology. Plaintiffs do not intend to posit that "the presence of 'powers of two' in a number in Lear's software means that the number is a binary number." Instead, Plaintiffs plan to show that Lear's particular use of a powers of two table in its code is just another way of converting to binary (finding each component power of two using the well known binary conversion method called the "subtraction method"), identifying the mirrored component powers of two, and then

converting the value of the identified mirrored component power of two back to trinary using Lear's power-of-two look-up table.

Plaintiffs' infringement case is based, in part, on the "Z-bit" in Lear's device. Plaintiffs' expert, Dr. Rhyne, has found and will opine that this Z-bit (which takes on the values 0 and 1) constitutes a binary code because it *represents* a series of component powers of 2. The Z-bit is used to generate the rolling code in binary as the transmitter uses the subtraction method to convert from trinary to binary, which Lear admitted to this court was a well known base conversion method.

Here is where Lear's powers of two table comes into play.



Response to Lear's MIL No. 7 (ii)



Response to Lear's MIL No. 7 (iii)



██████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████

█████████████████████████

Plaintiffs intend to introduce the table in only these ways: █████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ The

table does not include "binary numbers" any more than it includes "trinary numbers." It includes

trinary coded values of powers of two.

Given Lear's motion, Plaintiffs are concerned that Lear will try to argue that the table

includes "trinary numbers," a concept which will confuse the jury in this context. Plaintiffs

hereby cross-move for a Motion in Limine to prevent the same. Neither party should be allowed

to argue that the table includes binary or trinary numbers. It includes only powers of two under

the Federal Circuit's claim construction.

Response to Lear's MIL No. 7 (iv)

## I. BACKGROUND AND RELEVANT FACTS

A central infringement question in this case is whether Lear generates a "binary code" in its transmitter. Lear claims to have designed a transmitter that does not use a binary code. But Chamberlain hired a noted computer expert, Dr. Rhyne, who studied the Lear transmitter at length. He found that Lear's transmitter does indeed generate a binary code, and does so via the generation of a sequence of successive Z-bits. An exemplary binary number, thusly generated as a succession of Z-bits, is reproduced below (this is from Exhibit L to the March 1, 2010 Expert Report of J. Tipton Cole):



Dr. Rhyne explained that this sequence of Z-bits is not a mere random sequence of numbers, as Lear argues. Rather, this sequence of Z-bits is the generation of a binary number because the Z-bit represents a sequence of component powers of 2. It represents the powers of two found in the rolling code (or the binary converted value of the rolling code).

As Dr. Rhyne explains in his report, the fact that this is a sequence of component powers of 2 is exactly what makes this number a binary number:

188. It is common, but not required, to represent a binary number with 1s and 0s. The binary number $2^1 + 2^2 + 2^3$ may be represented as 1110. This is a representation of a series of component powers of 2 as shown below:



The "base" of the number signifies what component powers are used (base 2 signifies component powers of 2, base 3 signifies component powers of 3, etc.).  For instance, the binary number 1110 illustrated by Dr. Rhyne signifies 8+4+2+0 = 14 (or "fourteen," as expressed conventionally).  If these digits were a base 10 (decimal) number, the digits 1110 would signify component powers of 10, or 1000+100+10+0 ("one thousand one hundred ten").  In the Z-bit, the binary number is composed of a series of component powers of 2, and that is why the Z-bit constitutes the generation of a binary number.

Earlier in the case, Lear moved for summary judgment of noninfringement.  In opposition, Chamberlain argued "The Lear transmitter then determines the component powers of 2 of each counter value one digit at a time, which constitutes generation of a binary number." (D.I. 436, Chamberlain's Opposition to Lear's Motion for Summary Judgment of Non-Infringement of the '544 and '123 Patents and Cross-Motion for Summary Judgment Under the Proper Claim Construction of "Binary Code," at 6).  Chamberlain also argued "As Chamberlain experts Dr. Rhyne and Mr. Cole explain, *the generation of the zeros and ones* in the Z-bit register is, in substance, the generation of a binary number." *Id.* at 7 (emphasis added.)

Response to Lear's MIL No. 7 (vi)

Judge St. Eve accepted this testimony. She observed that expert Cole "finds binary numbers in the "special function register Status Z-bit[, which] fluctuates between 0 and 1 depending on whether a component power of 2 has been found in the counter." (D.I. 810, Memorandum Opinions and Order of November 24, 2010, at 16.) She found Dr. Rhyne and Mr. Cole's declarations explain that the Z-bit register's operation can give rise to the generation of a binary number "in substance." *Id.* at 23. She held that this testimony created an issue of fact at least as to Lear's infringement under the doctrine of equivalents. *Id.* at 30-31. The Court later held that "storage" is not required by the claim. Plaintiffs therefore will argue that the Lear transmitter literally infringes.



It is his opinion that the binary number is generated via the Z-bit. He does not contend, nor do Plaintiffs, that the table itself is the binary number.

## II.   ARGUMENT

### A.   Plaintiffs Should Be Allowed to Explain the Meaning of the Z-Bit to the Jury

Lear is seeking to handicap Plaintiffs' ability to show that the Z-bit is a binary number. Lear argues that "the argument of Plaintiffs and their experts is that the 'z-bit' in Lear's microprocessor generates a purported 'binary number' by oscillating between a '1' and a '0' when Lear's program is run," and that Lear's expert Dr. Schonfeld "will show at trial that the 'z-bit' is not even a number, much less a binary number . . . ." In other words, Lear would allow Dr. Rhyne to tell the jury that there exists a Z-bit, but *not* to explain why. Under Lear's plan, Dr. Schonfeld will be able to tell the jury (falsely) that the Z-bit is a random series of digits, but Plaintiffs should have no ability to explain what the Z-bit means.

This result not only would be unfair to Plaintiffs, but also would be inconsistent with the Court's prior orders. Taken together, Judge St. Eve's summary judgment order, and the Court's clarification re storage, signify that that the jury may the sequence of Z-bits to be to a binary number because it represents component powers of 2. In other words, Dr. Rhyne's opinion is that the sequence of Z-bits



has meaning as a binary number precisely because the sequence represents a series of component powers of 2. Plaintiffs should be allowed to explain this to the jury. The Federal Circuit has held that it is the meaning (substance), not the form, of the number that matters. *The Chamberlain Group, Inc., et al. v. Lear Corp.*, 516 F.3d 1331, 1339 (Fed. Cir. 2008). Thus, evidence about what the Z-bit represents helps the jury by explaining what the successive generation of binary 0's and 1's in the Z-bit means. It would be unfairly prejudicial to Plaintiffs to exclude such information.

**B.    Lear Mischaracterizes Plaintiffs' Position**

That Lear attempted to obfuscate its infringement by hiring mathematicians to perform "fun math" and numerous lawyers to instruct it to pre-compute the trinary representations of the powers of two in a look-up table should not now permit Lear to argue that the very confusion it is creating is too much for the jury to handle. The fact that Lear ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As the Federal Circuit made clear, form should not trump substance. *The Chamberlain Group,* 516 F.3d at 1339. Here Lear misses the fact that if

Response to Lear's MIL No. 7 (viii)

binary-coded trinary code must be trinary code, then a trinary coded powers of two table must be a powers of two table. That the "form" of the powers of two is coded in trinary does not detract from the fact that the table is substantively a power of two table, which Lear uses in order to identify powers of two, mirror them, and generate a trinary number in response.

Lear's assertion that determining the powers of two in a number the way that Lear does it (using the subtraction method) has nothing to do with binary is simply dead wrong. It is the very way numbers are converted. The crux of Lear's argument appears to be:

> Just because Lear's numbers happen to represent quantities that are powers of two does not make them "binary." . . . As this Court is aware and as the Federal Circuit recognized in this case, *any* number, including those that are "powers of two," can be represented in *any* base number system. (*Id.*; *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1336 n.1 (Fed. Cir. 2008).) For example, the decimal number 16 (sixteen) can be represented in trinary as 121. But the trinary number 121 and the use of that number is not a "binary code" or a "binary number" just because its value (sixteen) is a power of two.

Lear Brief at 2. Plaintiffs do not disagree that any number can be represented in any number system. Importantly, however, in order to convert that number into a new base, one needs to assess not whether it happens to be a power of that number (because as Lear points out that is irrelevant), but rather needs to perform a process akin to the subtraction method to determine for the new base each power of that new base present in the number. Lear's numbers don't "happen" to represent powers of two. They intentionally represent the powers of two so they can be used to determine the binary components of the rolling code and mirror the binary components of the rolling code.

Plaintiffs are not arguing that any one entry in the table of trinary representations of powers of two is itself a "binary number." Instead, as explained above, Plaintiffs are arguing the

use of the table to perform binary number conversion and mirroring is generating a binary number (even though that number is converted bit by bit back to a trinary representation).

Because Lear coded their powers of two in trinary and makes the arguments it makes in its motion in limine, Plaintiffs now justifiably fear that Lear will make the argument that it cannot be using a binary number because the table includes trinary numbers not binary numbers and does not include powers of two. Just as the Federal Circuit clarified that a binary-coded trinary number is still a trinary number, Plaintiffs ask this Court to clarify that a trinary-coded power of two is still a power of two (and to prevent Lear from arguing to the contrary). The real issue should come down to whether Lear avoided the patent in generating its binary number bit by bit. Confusing the jury with arguments about whether Lear's power of two table has binary numbers in it or trinary numbers in it will not serve any purpose except to divert the jury from its task.

## III.  CONCLUSION

For the foregoing reasons, Plaintiffs request that the court issue the following order which should clear up any issues: "Neither party shall argue or elicit testimony that Lear's power of two table contains binary or trinary numbers or should argue that the power of two table does not contain powers of two because those powers of two are represented in trinary."

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC., a Connecticut Corporation, and JOHNSON CONTROLS INTERIORS, LLC, a Michigan Limited Liability Company, <br><br> Plaintiffs, <br><br> v. <br><br> LEAR CORPORATION, a Delaware Corporation, <br><br> Defendant. | Civil Action No. 1:05-cv-03449 <br><br> Circuit Judge Richard A. Posner |

**PLAINTIFFS' RESPONSE TO LEAR'S MOTION IN LIMINE NO. 8 REGARDING THE KRAFT PATENT**

_____

As fully briefed in Plaintiffs' Motion in Limine 1, which is one of Plaintiffs' two most important motions, after pushing for Plaintiffs to narrow its case, Lear now pulls a one-eighty on one of its prior positions and seeks to complicate this case and confuse the jury with a patent that is not relevant. Lear is *not entitled* to have the jury hear about the Kraft patent. Lear's own witnesses testified that Lear does not practice the Kraft patent. Even if the algorithm Lear implements is similar in some ways to the algorithm described in the patent"s specification (which it is), that very specification admits that Lear is doing the equivalent of binary.

As for Lear's reliance on *Festo Corporation v. Shoketzu Kinzoku Kogyo Kabushiki Co., Ltd.*, (D.I. 949 at 2) Lear points out that *Festo* notes that "there is a strong argument that an

equivalent cannot be both nonobvious and insubstantial." 493 F.3d 1368, 1380 (Fed. Cir. 2007). Lear uses this quote to argue that because Kraft received a patent over two of the Chamberlain patents, Kraft's design was nonobvious in light of those patents. Lear therefore concludes the Kraft patent is evidence that Lear's product cannot be insubstantially different than Chamberlain's patents. The Kraft patent claims require:

> 1. A method comprising: obtaining a trinary rolling counter value stored in a transmitter upon the transmitter being actuated to remotely control a barrier; using a trinary function **void of any trinary to binary conversions** or any binary to trinary conversions to transform the trinary rolling counter value to a trinary code output **such that the trinary code output represents a trinary value that would be produced if the trinary rolling counter value were converted to binary, mirrored, had its highest ordered bit set to zero after being mirrored, and converted back to trinary;** combining the trinary code output with a trinary identification value stored in the transmitter to generate a trinary word, wherein the trinary identification value identifies the transmitter; and transmitting the trinary word from the transmitter for receipt by a receiver associated with the barrier.

> 10. A system comprising: a transmitter; a user activation input; a memory for storing a trinary rolling counter value and a trinary identification value, wherein the trinary identification value identifies the transmitter; a processor in communication with the user activation input and the memory, wherein the processor: (a) retrieves the trinary rolling counter value from the memory based on receiving a signal from the user activation input; (b) transforms the trinary rolling counter value to a trinary code output by performing a sequence of trinary operations **void of any trinary to binary conversions** or any binary to trinary conversions on the trinary rolling counter value; (c) interleaves the trinary code output and the trinary identification value to generate a trinary word; and (d) transmits the trinary word using the transmitter for receipt by a receiver; wherein the processor transforms the trinary rolling counter value to the trinary code output by: (i) initializing the trinary code output to zero; (ii) initializing an index (I) to N-1, where N is an integer representing the length of the trinary rolling counter value; (iii) comparing the trinary rolling counter value to $2^I$; (iv) if the trinary rolling counter value is greater than $2^I$, then subtracting in trinary $2^I$ from the trinary rolling counter value and adding in trinary $2^{(N-I-1)}$ to the trinary code output; (v) decrementing I by 1; and (vi) repeating steps (iii) to (v) until I equals zero.

> 17. A remote control system for remotely controlling a garage door responsive to a radio frequency (RF) signal modulated by a trinary code output,

the remote control comprising: an oscillator for generating a RF carrier signal; a modulator for modulating the RF carrier signal with a modulation signal; a user activation input; a memory for storing a previous trinary rolling counter value; control logic in communication with the modulator, the user activation input, and the memory, wherein the control logic in response to receiving an activation signal from the user activation input: (a) retrieves the previous trinary rolling counter value from the memory; (b) adds, in trinary, a fixed value to the previous trinary rolling counter value to produce a new trinary rolling counter value; (c) stores a copy of the new trinary rolling counter value as the previous trinary rolling counter value in the memory; (d) **performs, in trinary, a binary mirror operation, on the new trinary rolling counter value** to produce a trinary code output; (e) generates the modulation signal based on the trinary code output; and (f) transmits the RF signal to control the garage door.

Even if what Lear does in identifying every power of 2 in its trinary rolling code, mirroring those powers of 2, converting back to trinary using the powers of two table and adding does not literally entail "generating a binary number" or a "source of sequence of binary codes," it cannot be said that what Lear does is ***all trinary***. Putting the facts in the best light for Lear, at best Lear avoids literal infringement by performing binary conversion bit by bit. At best, Lear's design is in the grey region between Chamberlains' patents and Kraft's patent and thus *Festo* and the related cases are completely inapplicable. Since Kraft's patent was filed after this case was filed and was meant to memorialize Lear's litigation argument that they perform "all trinary," the claims do not describe what Lear does but rather how they would like the jury to see and pretend what they do. Lear's own witnesses confirm that there are differences between the patent and what Lear does. All of this makes *Festo* inapplicable here.

Adding in the Kraft patent is not necessary and would complicate this case in an unmanageable way. In the three weeks the parties have before trial, the parties would need to re-engage in expert discovery. Plaintiffs would want the opportunity to challenge the validity of the Kraft patent. The jury would have to hear an entire separate infringement case to determine whether Kraft would even be relevant. Even if Lear was able to convince the jury that it was

relevant, the jury would then be faced with competing statements in the patent itself that what Lear is doing is equivalent.

Because Plaintiffs addressed Lear's equivalents and willfulness arguments in its prior briefing, (D.I. 957 at pp. 4-21.), it will not repeat those arguments here. As to Lear's argument that Kraft is relevant to show lack of commercial success attributed to Plaintiffs' patents, Lear (again) pushes the factual record and the case law beyond its boundaries. Lear also makes a few other misstatements as to the law and record that Plaintiffs clarify below.

## I.     ARGUMENT

As the parties have repeatedly told this Court, evidence that is more prejudicial than probative should be excluded under Federal Rules of Evidence 403. Moreover, evidence that is irrelevant should be excluded under Federal Rules of Evidence 402.

### A.     The Kraft Patent Has No Bearing on the Secondary Consideration of Non-Obviousness Related to Commercial Success of Plaintiffs' Products.

The most glaring omission from Lear's brief is that there is not a single case citation that supports its contentions. Even if Lear's Car2U product *did* practice the Kraft patent, which it does not, Lear's brief is devoid of a single case citation showing that the secondary considerations of non-obviousness related to commercial success can be rebutted by a later filed patent covering a competitor's alleged work-around.

Additionally Lear has no admissible evidence that it actually practices the Kraft patent as previously explained. And, it should be noted that back in 2008—nearly two years before any expert reports were due—Lear realized the potential need for expert testimony to show that Car2U practiced the inventions disclosed in Kraft. (*See* Ex. 14 (August 8, 2008 letter from Mr. Anderson to Plaintiffs stating that proof that Car2U practices the Kraft patent "may be the

subject of expert testimony because it requires an opinion comparing the…patent claims with the accused Lear product.") Yet, Lear failed to provide a timely expert report on the matter.

Realizing it lacks any admissible evidence to show Car2U actually practices the Kraft patent, Lear relies on a *single sentence* from Mr. Cole's (Plaintiffs' expert's) deposition where he stated that the Kraft application helped in his analysis of the Lear device because it "contained a fair amount of information that was indicative of how the Lear device operated. And so I used it for that purpose." (D.I. 951, Ex.8 at 11:17-12:14.) Nowhere in Mr. Cole's testimony does he perform an element by element analysis of Kraft and the Car2U product. Mr. Cole does not even say that Car2U actually does what is in Kraft, only that Kraft was indicative of how it worked. Parts of Kraft are indicative of how the Lear device works, just as Lear can't dispute that parts of Chamberlain's patents are indicative of how the Lear device works. That fact is not dispositive of anything. Allowing the jury to hear evidence about the Kraft application, for the sole purpose of rebutting the commercial success secondary consideration, based on this single sentence from Mr. Cole would be extremely prejudicial.

**B.    Judge St. Eve's Ruling Did Not Consider Whether Lear Practiced the Kraft Patent.**

Plaintiffs respectfully note that Judge St. Eve's order noting that Lear could use the Kraft patent to argue that Car2U did not infringe under the doctrine of equivalents was not based on a finding that Car2U practices the Kraft patent. Moreover, Judge St. Eve's ruling was based on her review of the case law and her conclusion that "the existence of a patent *on the accused process* is not dispositive on the question of infringement under the doctrine of equivalents, but is instead significant to that determination." (D.I. 810, at 31 (emphasis added).) In other words, Judge St. Eve's ruling was based on the presumption that the accused process (i.e. Car2U)

practiced the Kraft patent. This comports with the case law, set forth in Plaintiffs' Motion in Limine No. 1 (D.I. 957 at pp. 4-21), which is clear: absent a showing the accused product practices the later issued patent, there is no probative value to the later issued patent under the doctrine of equivalents.

### C. Lear's Misrepresentation of the Previous Pleadings and Case Law.

Finally, Plaintiffs are compelled to point out Lear's strained reading of the factual record. Lear now conveniently at the eleventh hour, when its contradictory argument is dashed, and it realizes it has no evidence to support its claims, attempts to argue that it doesn't need any evidence because Plaintiffs have admitted that they do in fact practice the Kraft patent. Lear states multiple times in its brief that "Plaintiffs have **conceded** that Lear practices its [the Kraft] patent." (D.I. 949 at 5 (emphasis added); *see also id.* at 3 ("Plaintiffs previously **conceded** its admissibility" (emphasis added)); *id.* ("Judge St. Eve cited to ***Plaintiffs' admission***") (emphasis added).) Lear offers no quotes, no stipulations, no admissions, nothing whatsoever in the way of evidence to support any of these statements. In fact, the actual evidence shows exactly the opposite. For example, in their response to Lear's motion for summary judgment of non-infringement Plaintiffs stated: "***In addition, as a factual matter, Lear has not put forward any evidence that the accused product even practices the '613 Patent.***" (D.I. 422 at 13 (emphasis added).) Plaintiffs have remained entirely consistent in their position. Lear, on the other hand, has continuously shifted its positions. Below is a simple chart showing Lear's ever changing position over the past three years on this issue:

> July 23, 2008    Mr. Mpasu, Lear's 30(b)(6) witness, testifies that ***Car2U is different than Kraft's patent***. (D.I. 957-2, at Ex. 1.)
>
> September 8, 2008    Lear represents to this Court the Plaintiffs' theory that Car2U practiced the Kraft ***application*** "have been dashed." (D.I. 284 at

13.)

| June 19, 2009 | Lear represents to this Court that the Kraft **patent** *"is not the accused device"* in defending against to compel additional deposition testimony from Mr. Kraft. (D.I. 332 at 2.) |
| March 18, 2010 | On summary judgment, Lear argues Car2U practices the Kraft patent and this fact is ***dispositive*** of doctrine of equivalents. (D.I. 409 at 11 (categorically stating that the Kraft patent means "the accused product is patentably distinct and substantially different from the asserted patents, ***foreclosing relief*** under the doctrine of equivalents." (emphasis added).) |
| March 14, 2011 | Lear now argues Kraft is ***relevant*** to the doctrine of equivalents. (D.I. 949.) |

And while it is true that Plaintiffs cited case law showing that a later issued patent *could* be relevant to the doctrine of equivalents, Plaintiffs do not dispute that point. Plaintiffs submitted that case law to rebut yet another strained argument by Lear: that the Kraft patent *was dispositive* of a finding of no-infringement. Plaintiffs merely pointed out that *if* Lear was correct that Car2U practiced the Kraft patent, they could not win on summary judgment because they were *wrong on the law* that such a finding was *dispositive* of non-infringement. (*See* D.I. 422 (stating that "Lear makes the flawed legal argument that its product "cannot infringe" because it allegedly practices the '613."))

In addition to misrepresenting Plaintiffs' previous statements, Lear again improperly stretches and applies the case law. First, Lear makes another categorical statement that "the admissibility of the Kraft patent cannot be contested under settled Federal Circuit precedent." (D.I. 949 at 3.) To support this categorical statement, Lear cites "the seminal decision on this subject" and states that the Federal Circuit "***held***" as much in *Festo*. (*Id.* (emphasis added).) In fact, the quotes that Lear pulls from *Festo* are nothing more than dicta and *not* the holding of the Court. Even if Lear could be forgiven for calling this the *holding* they improperly apply that

*Festo* settles the admissibility of the Kraft patent. In fact *Festo* makes it clear that its dicta is predicated on a finding that the product practices the later issued patent; a fact Lear conveniently ignores. 493 F.3d at 1379-80 ("***when a device that incorporates the purported equivalent*** is in fact the subject of a separate patent, a finding of equivalency, while perhaps not necessarily legally foreclosed, is at least considerably more difficult to make out." (emphasis added).) Lear's reliance on *Siemens Medical Solutions v. Saint-Gobain Ceramics & Plastics, Inc.*, is also misplaced because again the accused product in *Siemens* practiced the later issued patent. ___ F.3d ___, 2011 WL 651790, at *7 (Feb. 24, 2011) (noting that the defendant's product was covered by a license to the later issued patent).

## II.    CONCLUSION

For the foregoing reasons, this Court should deny Lear's Motion in Limine No. 8 regarding the Kraft patent and prohibit Lear from introducing any evidence pertaining to the Kraft patent to the jury. Kraft's design efforts should otherwise be admissible.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

THE CHAMBERLAIN GROUP, INC., a
Connecticut Corporation, and JOHNSON
CONTROLS INTERIORS, LLC, a Michigan
Limited Liability Company,

      Plaintiffs,

      v.

LEAR CORPORATION, a Delaware
Corporation,

      Defendant.

Civil Action No. 1:05-cv-03449

Circuit Judge Richard A. Posner

**FILED UNDER SEAL**

**PLAINTIFFS' RESPONSE TO LEAR'S MOTION IN LIMINE NO. 9
REGARDING PLAINTIFFS' EXHIBITS**

## I.    INTRODUCTION

Plaintiffs hereby respond to Lear's motion in limine to preclude certain trial exhibits

offered by Plaintiffs.

## II.    ARGUMENT

**PTX 35**

PTX 35 is a document entitled " ████████████████████████████████

████████████████████████████ " The document itself describes its scope:

████████████████████████████████████████████

████████████████████████████████████████████

Response to Lear's MIL No. 9 (i)

 (PTX 35 at LEAR0000824) ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (*See e.g.*, Ex. 15, 2/11/10 Jurries Dep. at 32) The document also explains that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (*Id.* at LEAR0000829) It further provides ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (*Id.* at LEAR0000838.) Overall, the document provides a description of ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ The document is also relevant to willful infringement because it is probative of Lear's efforts to design a device that incorporates Chamberlain's proprietary algorithm.

Lear's argument that PTX 35 is not relevant because it is a "pre-production" specification is meritless. Mr. Bauman was Lear's 30(b)(6) witness on the design and operation of the accused Lear device, and as Lear acknowledges in its motion, he did not testify that the document was preliminary. He only testified that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (Ex. 16, 5/13/09 Bauman Dep. at 205-06) Lear has not established that the document does not describe the design or operation of the accused device. In addition, Lear did not produce any subsequent versions of this ▮▮▮▮▮▮▮ so there is no suggestion that the document is somehow preliminary. Moreover, even if the document itself is in some way preliminary, it is still relevant to the issues of infringement and willful infringement because Lear has not even suggested that its description of the design and operation of the UGDO in PTX 35 varies from the production version.

Regarding the relevancy of Lear's development of the accused Car2U product and its earlier versions of the accused product, see Plaintiffs' Response to Lear's Motion in Limine #1.

Lear's prejudice objection regarding compatibility is fully addressed in Plaintiffs' Response to Lear's Motion in Limine #4.

**PTX 36, 38, 40**

Lear's arguments with respect to PTX 36, 38 and 40 are fully addressed in Plaintiffs' Response to Lear's Motion in Limine #2.

**PTX 45**

PTX 45 is  Mr. Jurries was a former Lear software developer who oversaw a team of other software developers in the design and testing of the accused Lear device. (Ex. 15, 2/11/10 Jurries Dep. at 30) The subject of the chain of e-mails is ‌ and in the e-mail, Mr. Jurries is

(PTX 45 at LEAR00002676) Lear argues that the document is not relevant because it reflects designing-around, which is Lear's defense to the claim of willful infringement. Thus, by Lear's own admission, the e-mail chain is relevant to one of Lear's defenses.

Moreover, the document is relevant to secondary considerations of non-obviousness. Mr. Jurries reports in the e-mail that

(Id.) "Failure of others to provide a feasible solution to a long-standing problem is probative of non-obviousness." *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 835 (Fed. Cir. 1991). "Secondary considerations of non-obviousness must be considered when present." *Geo*

*M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010). Therefore, PTX 45 is relevant to rebut Lear's invalidity defense.

Lear's objection that inclusion of redacted portions is prejudicial is non-sensical. Plaintiffs should not be precluded from using admissible evidence just because Lear redacted allegedly privileged information. As discussed in Plaintiffs' Response to Lear's Motion in Limine #1, Lear has engaged in a campaign of claiming privilege as to any documents and testimony regarding the reasons and basis for its alleged design-around. So when Lear produces a partial document and shields the rest from the jury, the jury should know about the shield when it evaluates the document.

**PTX 47**

PTX 47 is a presentation that is probative of the commercial success of the JCI HomeLink® product covered by the patents-in-suit. The document states ███████████ ███████████████████████████ (PTX 47 at J033976) Therefore, this document is relevant to the secondary considerations of non-obviousness.

**PTX 48**

PTX 48 is a sales summary of sales of the accused Lear's accused from 2006 to 2010. Contrary to Lear's misstatement of the law, "the success of an infringing product is considered to be evidence of the commercial success of the claimed invention." *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000). Therefore, PTX 48, which summarizes Lear's sales, is relevant to the commercial success as one of the secondary considerations of non-obviousness. Lear's argument that proof of the commercial success of the accused Lear device would be prejudicial must be rejected because such a determination would categorically preclude the use of the success of the infringing product as evidence of commercial

success, which is contrary to the law. *See, e.g., id.* Further, as discussed in Plaintiffs' Response to Lear's Motion in Limine #8, Lear's sales records are relevant to show the fact of infringement.

## PTX 49-52 AND 55

Lear's arguments with respect to PTX 49-52 and 55 are fully addressed in Plaintiffs' Response to Lear's Motion in Limine #1.

## PTX 53

PTX 53 is a June 2002 e-mail chain between Jody Harwood, a product manager for the accused Lear device and ▮▮▮▮▮▮ In the e-mail, Mr. Harwood asks, ▮▮▮▮▮▮



▮▮▮▮ (PTX 53 at LEAR00009703) Therefore, the document proves that at least as early as 2002, Lear had knowledge that Chamberlain had patents covering its rolling code technology and that a license was needed. This evidence is relevant to secondary considerations of non-obviousness and willful infringement. In addition, Lear's arguments with respect to PTX 53 are also addressed in Plaintiffs' Response to Lear's Motion in Limine #2.

## PTX 54

PTX 54 is a June 2004 e-mail from Jody Harwood to several recipients, including individual from Lear and ▮▮▮▮▮▮ (PTX 54 at LEAR0010282) In the e-mail, Mr. Harwood states ▮▮▮▮



▮▮▮▮ (*Id.*) Therefore, the document proves that ▮▮▮▮

Response to Lear's MIL No. 9 (v)

██████████████████████████████████████████████

████████████████████████████████████ ) This evidence is

relevant to willful infringement and to rebutting Lear's claim that Skylink was compatible with

the Chamberlain garage door openers. See Plaintiffs Responses to Lear's Motions in Limine #1

and #4.

**PTX 55**

Lear's arguments with respect to PTX 55 are fully addressed in Plaintiffs' Response to

Lear's Motion in Limine #1.

**PTX 66**

Lear's objection to PTX 66 that inclusion of redacted portions is prejudicial is non-

sensical. Plaintiffs should not be precluded from using admissible evidence just because Lear

redacted allegedly privileged information. A discussed above with respect to PTX 45, when Lear

produces a partial document and shields the rest from the jury, the jury should know about the

shield when it evaluates the documents.

**PTX 70**

PTX 70 is a figure from the U.S. Patent Application of Clifford Kraft that was marked

during the deposition of Mr. Kraft. The exhibit, as marked during the deposition, includes

handwritten notes made by Ms. Lutton while she was examining Mr. Kraft regarding the exhibit.

Ms. Lutton's notes are not hearsay because they are not being offered for the truth of the matter

asserted. Fed. R. Evid. 801. Plaintiffs are not submitting the exhibit as evidence of Ms. Lutton's

knowledge of the Kraft patent application, and the veracity of Ms. Lutton's notes are not in

question. Rather, PTX 70 is admissible evidence of the operation of the accused Lear device,

and the hand written notes do not convert the document into hearsay.

Response to Lear's MIL No. 9 (vi)

Even if Ms. Lutton's notes would constitute hearsay (which they do not), they are a present sense impression and are therefore an exception to hearsay under Fed. R. Evid. 803(1). Ms. Lutton made the notes while examining Mr. Kraft regarding the document. Therefore, PTX is at least admissible hearsay.

**PTX 71**

Lear concedes in its motion that PTX 71 is not hearsay if it is being offered for the truth of the matter asserted. The exhibit is an e-mail from  (PTX 71 at NSHN000757). Software code is attached to the e-mail. (*Id.*) Plaintiffs are not offering the exhibit as evidence of JCI's software code which is the truth of the matter asserted in the e-mail. Rather, Plaintiffs are offering the exhibit as evidence that Mr. Kraft had received the e-mail transmission purporting to include the JCI code at the time he was attempting to determine how the JCI device worked. In addition, even if PTX 71 is would constitute hearsay (which it does not) it is a record of regularly conducted activity and is therefore an exception to hearsay under Fed. R. Evid. 803(6). Mr. Kraft testified at his (Ex. 17, 5/27/10 Kraft Dep. at 575:4-580:16) Therefore, PTX 71 is at least admissible hearsay.

Lear's foundation objection is new. Lear did not assert a foundation objection in its Revised Exhibit C2 to the Proposed Final Pretrial Order. Lear, therefore, should be barred from injecting new objections as this juncture. Notwithstanding the late objection, the foundation for the exhibit was laid during the deposition of Clifford Kraft and is contained in the Kraft

testimony that Plaintiffs designated. (*Id.* at 575:4-580:16) Therefore, in addition to being a newly raised objection, Lear's foundation objection is also improper.

**PTX 83-84**

Lear's arguments with respect to PTX 83 and 84 are fully addressed in Plaintiffs' Response to Lear's Motion in Limine #2, which Plaintiffs incorporate by reference.

**PTX 85-86**

PTX 85-86 are ███████████████████████████████████ ███████████████████████ These agreements are relevant to the issue of willful infringement because they are evidence of Lear's awareness of the need to obtain a patent license from garage door operators before incorporating their patented technology into Lear's device. Lear's failure to obtain a license from Chamberlain, and subsequent incorporation of Chamberlain's algorithm into the accused Lear device constitutes willful infringement. PTX 85-86 are evidence of Lear's state-of-mind.

**PTX 87**

Lear's arguments with respect to PTX 87 are fully addressed in Plaintiffs' Response to Lear's Motion in Limine #2.

**PTX 88**

PTX 88 is letter in which Lear ██████████████████████████████ ███████████████████████████████████ The exhibit is relevant to the issue of willful infringement because it is evidence that Lear's continued to sell infringing devices with the awareness that its customers were seeking indemnification for claims made in this lawsuit. PTX 88 is therefore evidence of Lear's state-of-mind. It is also evidence of infringement because it shows that Lear was using infringing transmitters.

Response to Lear's MIL No. 9 (viii)

**PTX 105**

Lear's arguments with respect to PTX 105 are fully addressed in Plaintiffs' Response to Lear's Motion in Limine #1.

**PTX 121-128**

The press releases in PTX 121-128 reflect JCI's receipt of various awards for the Homelink product and are relevant to the issue of non-obviousness because they are evidence that Lear received praise by others, which is another of the secondary considerations of non-obviousness. *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010). They qualify as hearsay objections under Fed. R. Evid. 803(6) as records of regularly conducted activity of JCI and/or TheAutoChannel.com (PTX 125 only).

Lear's argument that PTX 121-128 are not relevant because they have no connection with the patented technology is also improper. The press releases are related to JCI's HomeLink product with is covered by the patents-in-suit.

Lear's argument that Plaintiffs have not established a connection between the inventions in the patents-in-suit and commercial success is incorrect. A nexus can be shown in various ways. "If the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed." *Brown & Willamson Tobacco Corp. v. Philp Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000); *see also* J.T. Eaton & Co. v. Atlantic Paste & Glue Co., 106 F .3d 1563, 1571 (Fed. Cir. 1997)("When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention."). Moreover, nexus can be shown where the product itself "would not exist without the claimed invention." *Mitsubishi Chems. Corp. v. Barr Labs., Inc.*, 718 F. Supp. 2d

382, 437 (S.D.N.Y. June 2010)("The product itself would not exist without the claimed invention, and therefore there is a nexus between the commercial success of [the product] and the patented invention."). Here, JCI's HomeLink® product embodies the patents-in-suit. Therefore, nexus is presumed. Moreover, if JCI's product did not use the Chamberlain algorithm, it would not operate Chamberlain garage door openers. Lear's argument that Plaintiffs have not shown a connection between commercial success and the patent-in-suit fails.

**PTX 131-138**

Plaintiffs' intend to admit into evidence physical exhibit PTX 132, which are actual accused Lear transmitters tested by Plaintiffs' technical experts. It will be beneficial to the jury to be able to physically touch and feel the accused product, and there is no risk of prejudice or jury confusion. PTX 131 and 133-138 will be used as demonstrative exhibits.

**PTX 139-140**

PTX 139 and 140 are actual screen captures taken from a signal analyzer during Dr. Rhyne's testing of the accused Lear device. They constitute the data that he relied on in arriving at his opinion that the accused product infringed the patents-in-suit, and he explains in full detail in his expert report the methodology he used to obtain the data depicted in PTX 139 and 140. The data depicted in PTX 139 and 140 are not hearsay because they are not "statements" as defined by under Fed. R. Evid. 801. "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a). Screen captures of Dr. Rhyne's testing of the accused Lear device do not qualify as statements under Fed. R. Evid. 801.

Lear's relevance and prejudice arguments are without merit. Dr. Rhyne's testing of the accused device is relevant to Plaintiffs' proof of infringement and does not present any risk of prejudice.

**PTX 160, 161-165**

PTX 160 is a collection of screen captures recorded by one of Plaintiffs' expert, Mr. Tipton Cole while testing the accused Lear device. PTX 161-165 are videos that Mr. Cole recorded of his testing. Dr. Rhyne is relying on this data to support his opinion that the accused product infringed the patents-in-suit. Mr. Cole explains in full detail in his expert report the methodology he used to conduct the testing and obtain the screen captures and videos in PTX 160 and 161-165. The data depicted in PTX 160 and 161-165 are not hearsay because they are not "statements" as defined by under Fed. R. Evid. 801 for the same reasons as set forth above with respect to PTX 139-140.

Lear's authenticity objection under Fed. R. Evid. 901 to PTX 160 must be rejected because Mr. Cole explained in full detail in his March 1, 2010 expert report how he conducted the testing and collected the screen prints.

Moreover, Lear's objection regarding the Z-bit status registers shown in PTX 161-165 is improper because Plaintiffs' expert, Dr. Rhyne, will explain to the jury how the Z-bit operates. There will be no risk of confusing the jury. Lear's objection is nothing more than a poorly disguised non-infringement argument. Plaintiffs are entitled to present evidence of the Z-bit to the jury as part of the proof of infringement.

**PTX 170-176**

PTX 170-176 are Lear's executable code that was tested by Mr. Cole as set forth in his expert report. Plaintiffs' expert, Dr. Rhyne, relies on Mr. Cole's testing of the executable code

contained in PTX 170-176 as part of his infringement analysis. Therefore the executable code is relevant to infringement.

## PTX 181-182

PTX 181-182 are records of JCI's royalty payments to Chamberlain and JCI's unit sales of its HomeLink® product covered by the patents-in-suit. These reports are evidence of the commercial success of the patents-in-suit, and are therefore relevant to show non-obviousness. Lear is incorrect in arguing that Plaintiffs have conceded that PTX 181-182 are inadmissible. Plaintiffs assert that the reports are admissible hearsay under Fed. R. Evid. 801(6) because they are business records of Chamberlain and JCI. If necessary, Plaintiffs will establish foundation for the reports through live testimony at trial.

## PTX 185-187

PTX 185-187 are NBC news video segments from a report regarding the security problem of "code grabbers." The videos are relevant to the issue of non-obviousness because they are evidence of a long standing problem or need, which is another of the secondary considerations of non-obviousness. *See e.g., Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 935 (Fed. Cir. 1990). The videos are not hearsay under Fed. R. Evid. 801 because they are not being offered for the truth of the matter asserted. The videos assert that thieves can break into homes or garages by using code grabbing equipment. Plaintiffs offer the videos as evidence that the code grabbing was broadcast on television and known to the public, and that the patents-in-suit addressed, and were one way to solve, that problem. Therefore, the videos are not hearsay under Fed. R. Evid. 801(c).

**PTX 188-190**

PTX 188-190 are additional videos recorded by Mr. Cole during his testing of the accused Lear device and relied upon by Dr. Rhyne is relying on this data to support his opinion that the accused product infringed the patents-in-suit. These videos, as recorded data, are admissible for the same reasons as set forth above with respect to PTX 160 and 161-165.

**PTX 197**

PTX 197 is Lear's response to an interrogatory that asks Lear to "list by Patent Number or Application Number each U.S. or other Patent or Patent Application practiced or embodied in part or in full in an of the Accused Products." In its response, Lear states █████████ ████████████████████████████████████████ (PTX 197 at 5) As of the Lear provided this response, the Kraft patent application had published, therefore Lear's response is an admission that the application does not embody all aspects of its Car2U product. Lear now tries to retract that admission by arguing that its Car2U product is covered by the patent issuing from the very same Kraft application that it previously admitted did not cover the product. Lear cannot hide behind its inconsistent statement by arguing jury confusion. Lear's admission is relevant to infringement, and Plaintiffs are entitled to present Lear's discovery admissions to the jury. See Plaintiffs' Response to Lear's Motion in Limine #8.

**PTX 211**

Lear's arguments with respect to RFAs 88-157 in PTX 211 are fully addressed in Plaintiffs' Response to Lear's Motion in Limine #7. Lear's arguments with respect to RFAs 179-180 are fully addressed in Plaintiffs' Response to Lear's Motion in Limine # 4. With respect to Lear's responses to RFAs 194 and 200 in PTX 211, again Lear tries to retract that admission by arguing that its Car2U product is covered by the patent issuing from the very same

Kraft application that it previously admitted did not cover the product. As discussed above with respect to PTX 197, Lear's objections are meritless.

**PTX 218-223**

PTX 218-223 are JCI's compatibility agreements with garage door opener and lock manufactures. These agreements are relevant to Lear's willful infringement because they are evidence of industry practice in licensing proprietary technology. Lear's unlicensed use of Chamberlain's technology, particularly in light of industry standards shown in PTX 218-223 constitutes willful infringement.

**PTX 225**

PTX 225 is an excerpt from Dr. Rhyne's textbook, *Fundamentals of Digital System Design* regarding the concept of space/time equivalence and storage of data in a computer. The excerpts were attached as Exhibit C to Dr. Rhyne's February 21, 2011 Declaration Regarding the Issue of "Storage" in the Patent Claims (Docket No. 902-1). Therefore, PTX 225 is of record in the case, and was used by Dr. Rhyne to explain to the Court why Lear's late asserted defense regarding "storage" was incorrect. In view of the Court's ruling on storage, this excerpt from Dr. Rhyne's book is relevant to rebut Lear's factual argument that Lear does not generate binary code in the Z-bit.

**PTX 226**

PTX 226 is another excerpt from Dr. Rhyne's textbook, *Fundamentals of Digital System Design* that discusses conversion of numbers from one base numbering system to another. Lear objects to PTX 226 as an incomplete because it contains excepts of Dr. Rhyne books rather than complete chapters. Plaintiffs excerpted the book to remove irrelevant portions in an effort to shrink their exhibit list. If Lear wanted to use other portions of Dr. Rhyne's book, then Lear

should have included those portions on its exhibit list. Notably, Lear does not provide any support for its argument that the excerpts are somehow prejudicial to Lear or present a risk of confusing the jury.

**PTX 227**

PTX 227 is an excerpt from the IEEE Standard Dictionary of Electrical and Electronics Terms (6th Edition). Page 1049 of PTX 227 was attached as Exhibit C to Dr. Rhyne's February 21, 2011 Declaration Regarding the Issue of "Storage" in the Patent Claims (Docket No. 902-1). Therefore, PTX 225 is of record in the case, and was used by Dr. Rhyne to explain to the Court why Lear's late asserted defense regarding "storage" was incorrect. In view of the Court's rulings on storage, this excerpt from Dr. Rhyne's book is relevant to rebut Lear's factual argument that Lear does not generate binary code in the Z-bit.

**III.    CONCLUSION**

For all the above reasons, Plaintiffs respectfully request that the Court deny Lear's motion in limine to exclude the foregoing exhibits at trial.

Dated:  March 17, 2011                    FISH & RICHARDSON P.C.


                                          By:  /s/ Tamara Fraizer
                                               Tamara Fraizer


                                          Katherine Kelly Lutton (CA #194971)
                                          (lutton@fr.com)
                                          Tamara Fraizer (CA #215942)
                                          (fraizer@fr.com)
                                          Scott A. Penner (CA #253716)
                                          (penner@fr.com)
                                          FISH & RICHARDSON P.C.
                                          500 Arguello Street, Suite 500
                                          Redwood City, California 94063-1526
                                          Telephone:  (650) 839-5070
                                          Facsimile:  (650) 839-5071

                                          Frederic R. Klein (ARDC #3127304)
                                          (frederic.klein@goldbergkohn.com)
                                          GOLDBERG KOHN LTD.
                                          55 East Monroe Street, Suite 3300
                                          Chicago, Illinois 60603
                                          Telephone: (312) 201-4000
                                          Facsimile: (312) 332-2196

                                          J. Michael Huget (MI P39150)
                                          (mhuget@honigman.com)
                                          Deborah J. Swedlow (MI P67844)
                                          (bswedlow@honigman.com)
                                          HONIGMAN MILLER SCHWARTZ & COHN
                                          LLP
                                          130 South First Street, Fourth Floor
                                          Ann Arbor, Michigan 48104
                                          Telephone: (734) 418-4200
                                          Facsimile: (734) 418-4201

                                          Attorneys for Plaintiff
                                          JOHNSON CONTROLS INTERIORS, LLC

Dated: March 17, 2011                    FITCH, EVEN, TABIN & FLANNERY


By:   /s/ Karl R. Fink
        Karl R. Fink

Karl R. Fink
(krfink@fitcheven.com)
John F. Flannery
(jfflan@fitcheven.com)
Rudy I. Kratz
(rkratz@fitcheven.com)
Allen E. Hoover
(ahoover@fitcheven.com)
Joseph F. Marinelli
(jmarinelli@fitcheven.com)
120 South La Salle, Suite 1600
Chicago, IL  60603-3406
Telephone: (312) 577-7000
Facsimile: (312) 577-7007

Attorneys for Plaintiff
THE CHAMBERLAIN GROUP, INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true copy of the foregoing PLAINTIFFS'

RESPONSES TO LEAR CORPORATION'S MOTIONS IN LIMINE was served upon the

below listed counsel of record on this 17th day of March, 2011 by Electronic Mail:

Kimball Richard Anderson       Attorneys for Defendant
Samuel Mendenhall               LEAR CORPORATION
Kathleen B. Barry
Ivan Michael Poullaos
Imron T. Aly
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601


Frank A. Angileri              Attorneys for Defendant
Thomas A. Lewry             LEAR CORPORATION
Brooks Kushman P.C.
1000 Town Center, Twenty Second Floor
Southfield, MI 48075-1238


                                    _/s/ Tamara Fraizer_____
                                   Tamara Fraizer (CA #215942)
                                   (fraizer@fr.com)
                                   FISH & RICHARDSON P.C.
                                   500 Arguello Street, Suite 500
                                   Redwood City, California 94063-1526
                                   Telephone:  (650) 839-5070
                                   Facsimile:  (650) 839-5071

50763616.doc